ROBERTA BROWN, RESPONDENT, v. THE ALTON RAILROAD COMPANY AND W. L. SLATTER, APPELLANTS.—151 S. W. (2d) 727.

Kansas City Court of Appeals. January 27, 1941.

*Bagby & Pierce* and *Johnson & Bacon* for respondent.

32

36

38

40

*W. H. Meschede, Jack Denny, A. W. Walker* and *Charles M. Miller* for appellants.

44

SPERRY, C.—This is a suit by Roberta Brown, a widow, plaintiff below, to recover damages against The Alton Railroad Company, a corporation, and W. L. Slatter, defendants below, for the death of plaintiff's husband in a crossing accident. Plaintiff had a judgment and defendants appealed to this court. We handed down an opinion affirming said judgment but thereafter a rehearing was granted. The case was again duly argued and submitted and the judgment was affirmed. [Brown v. Alton Railroad Company, 132 S. W. (2d) 713.]

The cause was removed to the Supreme Court on a writ of *certiorari*, and that court, in due time, rendered an opinion (State ex rel. Alton R. R. Co. v. Shain, 143 S. W. (2d) 233). A careful study of the opinion of the Supreme Court reveals that the opinion of this court was not criticised, in any respect, as to the matters urged by defendants in that proceeding; but the Supreme Court, of its own motion, quashed our record because of two erroneous legal declarations contained in our opinion, neither of which declarations, we think, having been essentials of the opinion, and said, l. c. 238, 239:

"In the *particulars* and for the reasons specified, this record of the Court of Appeals, should be quashed and it is so ordered."

We do not interpret the language used by the author of the opinion as indicating that it was intended to quash the record of this court, excepting as to the "*particulars*" therein mentioned. However, by its *mandate*, the Supreme Court quashed our record. Consequently we think we are required to render a new opinion in this case.

This cause of action grew out of a collision occurring about 4:30 P. M., of December 3, 1934, between a train of the defendant railroad company, being operated by the defendant, Slatter, and a trailer-truck, in which deceased was riding. The collision occurred at a point where the railroad tracks of the defendant railroad intersect Jefferson Avenue in Marshall.

The facts show that Jefferson Avenue at and near the railroad crossing is a much traveled public street; that while the crossing is located near the city limits, there are a number of houses in the vicinity. Jefferson Avenue runs north and south. The railroad enters the city limits from the east, crossing Slater Street and then Odell Avenue before arriving at Jefferson Avenue. It would appear that Slater Street and Odell Avenue run parallel with Jefferson Avenue. The railroad runs somewhat from a northeasterly to a southwesterly direction at the crossing. There are three railroad tracks there. The train that caused the collision was running on the south track. The truck in which plaintiff's husband was riding was proceeding north on Jefferson Avenue. The only eye-witness as to what happened immediately prior to the time of the collision was plaintiff's witness, Berry, who was the driver of the truck.

He testified that the truck consisted of a tractor with a trailer attached thereto; that the tractor weighed 3200 pounds and the

trailer 6500 pounds; that the trailer was ten feet, four inches in height; that from the back end of the trailer to the extreme front end of the tractor it was thirty feet, seven inches; that from the back of the seat of the tractor to the front axle it was five feet, ten inches; that from the seat of the driver to the extreme front end of the tractor it was seven feet, ten inches; that the seat of the tractor was between three and four feet from the ground.

He further testified that he and his father operated the trailer-truck for the transportation of live stock and that on this occasion he had been employed by one Clough to haul some steers for him from Clough's farm to Marshall. After being so employed, the witness, a man about twenty years of age, left Marshall in the morning, with Mr. Clough and the deceased, Clough's son-in-law, to go to Clough's farm and get the steers and transport them to Marshall; that he was unable to drive the truck all the way to the farm on account of the condition of the roads and Clough and deceased went to the farm and drove the steers until they reached the truck and then loaded them into it, at or near Glasgow; that the three men left Glasgow in the afternoon, to return with the steers to Marshall; that the steers belonged to Clough and it was the understanding had with Clough and deceased that they should go along, riding in the truck with the witness.

Berry further testified: "When I drove a truck I tried to take care of the truck and watch the road closely. If anyone is in the cab they don't have anything to do with the driving. . . . The owner usually rode with the cattle;" that Clough and deceased intended to unload the cattle when they arrived at the public sale lot north of Jefferson Avenue. "Q. And that is the reason they (Clough and deceased) were riding with you, wasn't it? Mr. Pierce: We object to that as calling for a conclusion. A. No, sir; when the cattle were in the truck I took care of them while they were in the truck;" that the cattle did not belong to deceased, but he was helping Clough "get the cattle." "Q. Well, you agreed to go over there and get the cattle for a stipulated sum? A. Yes, sir. They wanted to know if they could go along and it is always agreeable."

As the truck approached the railroad crossing Berry was driving it with deceased sitting immediately to the right and Clough was seated immediately to the right of the latter, there being three on the seat with deceased in the middle. As the front wheels of the truck came upon the south rail of the main line track, the southwest corner of a westbound passenger motor-train, consisting of two cars, struck the right front wheel and bumper of the truck, turning the truck to the west and injuring deceased and Clough, which injuries resulted in their deaths, Berry surviving, although injured.

There was evidence tending to show that Jefferson Avenue was

covered with ice and snow and was very slick but there was no snow or ice on the railroad tracks.

Berry further testified that he was familiar with this railroad crossing; that as he approached the crossing a line of shrubbery to the east obstructed his view, the line of shrubbery being off of the south line of the railroad right-of-way and running thirty to forty feet along it; that there were also telegraph poles and a crossing sign on the right-of-way, which also obstructed the view, to some extent; that, as he approached the railroad crossing, he could see down the railroad track to the northeast as he traversed about 140 feet before his view became obstructed; that thereafter and when he ''was within about 117 feet of the track there was an opening between some shrubbery and a coal shed back of this Marshall lot and I could see the track a few feet there—I could see (a point) down the track 344 feet;'' that he looked east at this 117 foot point and could not see any train; that until he arrived at a point about fifty or sixty feet of the track the shrubbery obstructed his view; that when he reached a point fifty feet from the track he could look eastwardly around the shrubbery and see down the south rail of the track 178 feet and on the north rail 218 feet; that seeing no train in sight and hearing no whistle, he looked to the west and then back toward the east; that when he last looked toward the east he was within twelve feet of the track, the front of his truck being eight feet from the track. He then for the first time saw the train. He further testified that had he seen the train in time he could have stopped within twenty or twenty-five feet of the track; that he did not see the train until it was right on him; that he applied his brakes, cut his front wheels to the left and the train hit the right front wheel and bumper of the tractor, throwing the tractor around to the west and upsetting the trailer.

Berry testified that he approached the crossing at the uniform rate of speed of twelve miles per hour; that at no time did he change the rate of speed; that when he was within fifty feet of the track he heard no whistle or bell and, seeing no train, he continued onward at the same rate of speed; that there was a crossing bell thirty feet west of the intersection and that this bell was not ringing. Other witnesses on the part of plaintiff testified that no sound or signal was given of the approaching train. However, a great number of other witnesses, some of whom were plaintiff's, testified that such signals were given.

Berry testified that he did not notice what deceased and Clough were doing as he approached the railroad track; that they were on the seat beside him, awake, and that they had been talking about ten or fifteen minutes before; that he could see their faces; that they knew they were approaching the railroad crossing.

Plaintiff placed upon the stand the defendant, Slatter, who testified that he was the operator of the train, which consisted of two cars; the front car being equipped with a gasoline motor in the front end which generated electricity for the operation of the train. Photographs of this car were introduced in evidence. Its front end appears to be more or less flat except that it had a head-light over the top and a pilot at the bottom. It has two windows in the front end with a radiator between them extending from the top to the bottom of the car. The evidence shows that this radiator extends about two feet in front of the main part of the car and the windows. Slatter was operating the train and another operator, Driscoll, was instructing him as to its operation. They were behind the window on the north side of the train. Slatter was situated about three feet to the rear of the window, Driscoll was back of him. With reference to this window, Slatter testified: "It sloped from the center of the back slightly—it slopes from where it connects with the front of the car to the back;" that he was seated on a seat which was located above and about six inches to the right of the north rail of the track; that he had been operating ordinary freight trains for the railroad company for a great many years and was familiar with the conditions of the crossing. He testified that the train was traveling about fifteen miles per hour as it approached the crossing; that he first saw the truck when its front wheels were just over the south rail on the track; that this was when his train was upon the crossing and at the time when the train and the truck came together; that he "reached to the brake-valve" and stopped the train in about 140 feet; that when an air valve is broken off it sets the brakes "right now;" that he guessed there was no question but that he could have stopped the train in that distance from Slater Street clear on up to the crossing. He testified that the train he was operating had a "throttle like a steam engine, only it was for gas; and a brake the same as a steam engine. Q. You have a big gasoline engine? A. Yes, sir. Winton Six. Q. That generates electricity and it is electrically operated? A. Yes, sir; "that if the train had been going thirty-five miles per hour it would have taken a greater distance for him to have stopped it."

He testified that the radiator of the motor-train interfered with his view to the south; that he put the train "in emergency . . . just as soon as I possibly could;" that he could have seen the crossing when "I was right close, 500 feet from it."

Driscoll, testifying for the defendants, stated that the train went over the crossing at a rate of speed of fifteen miles per hour; that the first time he saw the truck was when it was on the crossing; "as we went upon the crossing I saw the truck wheels coming up;" that he could not see all of the truck; that Slatter, then "set the air and stopped the train;" that the rear coach of the train just cleared

the crossing; that the train was stopped in about 130 feet. Later he said Slatter stopped the train in 120 to 130 feet; that Slatter, at any time, after the train left Slater Street, could have stopped the train within the same distance after an emergency had arisen. He was asked: "Q. On account of the angle that this train came into Jefferson Avenue crossing the position of the engineer on the right side of the cab would be such that he could look down Jefferson Avenue much more easily than if it came in at right angle, couldn't he? . . . A. Yes, he could see a little further at the angle." He further testified: "Q. How far east could you look and see Jefferson Avenue crossing? A. Well, around about Slater Street I think you could see the Jefferson Avenue crossing—about 400 feet.. . . . Q. You knew this Jefferson Avenue crossing was a much traveled crossing, didn't you? A. Yes, sir. . . . Q. You had not slowed down in between Jefferson Avenue and Odell Avenue, had you? A. No, sir. . . . Q. Now, how large is the window that you looked out of in the front of that cab? A. About twenty-four inches square. . . . Q. Were you and Mr. Slatter looking ahead as you approached that Jefferson Avenue crossing? A. Yes, sir."

There was evidence tending to show that the train, after it reached Odell Avenue crossing, continued at a speed of thirty, thirty-five, and forty miles and a fraction per hour.

The case was submitted to the jury by plaintiff upon violation of the speed ordinance and the humanitarian doctrine in defendant's failing to stop the train and slacken the speed thereof. The petition pleaded a failure to warn but this was abandoned.

Over the objection of the defendants, the court permitted plaintiff to introduce the speed ordinance of the city of Marshall, which was duly certified by the city clerk, under seal, as being a true copy of Ordinance No. 1315 of record and on file in his office. This ordinance, as introduced, reads as follows:

"Ordinance No. 1315—Misdemeanors, Ordinance Defining Misdemeanors or Offenses Against the City of Marshall, and Prescribing the Punishment Therefor. 'Section 46: It shall not be lawful within the limits of the City of Marshall for any railroad, engine, car or cars to be run at a rate of speed exceeding fifteen miles per hour, and any person or persons so offending against the provisions of this ordinance shall be fined not less than twenty-five nor more than one hundred dollars.'

"Passed by the City Council this 30 day of March, 1925. Frank H. Naylor, President of City Council. Approved this 30 day of March, 1925. Frank H. Naylor, Mayor. Filed March 30, 1925. C. D. Alexander, City Clerk."

Defendants objected to the introduction of the ordinance on the ground that "there is no proof of the ordinance. They are now

contending that the court erred in permitting its introduction. We think there is no merit in this contention. Section 1663, Revised Statutes of Missouri, 1929 (Mo. Stat. Ann., par. 1663, p. 3970), provides:

"Printed copies of the ordinances, . . . and manuscript or printed copies of such ordinances, . . . certified under the hand of the officer having the same in lawful custody, with the seal of such city or town annexed, shall be received as evidence in all courts and places in this state, without further proof; . . ."

It is claimed by the defendants that the statute "contemplates the certification by the clerk of the usual and customary book of ordinances, which book, on the first page, recites the necessary things to entitle the book of ordinances to be admitted in evidence; . . . the certification of the clerk, . . . is not in compliance with the statute."

. The portion of the statute above quoted authorized the introduction of the ordinance in question.

It is claimed, however, that it is not shown that the ordinance was in force and effect on December 3, 1934. The ordinance purports to have been approved on the 30th day of March, 1925. If it was thereafter repealed and was not in force on December 3, 1934, the burden was upon the defendants to so show.

However, it is urged that the ordinance is unreasonable because it applies to any place within the corporate limits of the city and not alone at railroad crossings. Ordinances can be declared reasonable as to certain localities and unreasonable as to others. [See Murrell v. Kansas City, St. Louis & C. R. R. Co., 279 Mo. 92, 106, 213 S. W. 964; Zumault v. Kansas City & I. Air Line, 71 Mo. App. 670.] The ordinance was not unreasonable as to the crossing in question on account of the fact that it was a much traveled crossing and it was in a part of the city that was built up with houses. [Zumault v. Kansas City & I. Air Line, supra.] The cases of Zumault v. Kansas City & I. Air Lines, supra; White v. St. Louis & S. F. Railroad Co., 44 Mo. App. 540, and City of Plattsburg v. Hagenbush, 98 Mo. App. 669, 73 S. W. 725, cited by defendants were distinguished in Murrell v. Kansas City, St. L. & C. N. R. Co., supra, 279 Mo. 1. c. 106, 107, 213 S. W. 964, at page 108 of 279 Mo., and at page 967 of 213 S. W. it is stated:

"We do not find, upon a careful examination of the authorities cited by appellant, any ground for holding the ordinance in controversy void. On the other hand, by a long and unbroken line of decisions in this State six-mile speed ordinances have been upheld by this court in cities and towns where they were necessary for the public welfare and to prevent accidents at public crossings." (Italics ours.)

In the case at bar we have to do with a fifteen-mile ordinance.

However, it is contended by the defendants that, since the decisions in these cases, and the advent of motor vehicles, speed has become much faster, and greater speed than then allowed is considered reasonable. It is true that equipment, especially braking, of motor vehicles has been greatly improved in recent years and the statutes governing their speed have permitted a much greater speed by such vehicles than formerly. The fact that such equipment, is steadily improving the ability of the drivers of motor vehicles to stop them may have some bearing upon the question of the reasonableness of ordinances relating to the speeds of motor vehicles or light motor-trains equipped with brakes as effective as ordinary motor vehicles, or more so. However, we do not think that a speed of fifteen miles per hour at the place involved in this case is to be held to be unreasonable under the facts. A similar argument to that made by defendants in this case was urged before the Supreme Court in Thompson v. St. Louis-San Francisco R. Co., 334 Mo. 958, 69 S. W. (2d) 936, and it was disallowed.

However, it is urged that the ordinance is penal and must be strictly construed and that it does not purport to apply to corporations and was inadmissible as to the corporate defendant. Of course, if it was admissible as to either of the defendants, it was properly admitted in evidence. It appears that the sole ground upon which the ordinance was objected to was that there was no proof of its existence and not on the ground now urged by defendant. However, we think that the ordinance was admissible as to the corporate defendant.

In the first part it prohibits any railroad to be run at a rate of speed of fifteen miles per hour. The language there is awkward but undoubtedly refers to railroad trains. It is doubtful if there is any railroad being operated in this State, then or now, other than by a corporation, unless in the hands of receivers of corporations. If there are any others they are few. No doubt, at least in the first part of the ordinance referring to "raiload, engine, car or cars," the city council had reference to corporations as well as natural persons. The latter part of the ordinance prescribing the penalty, refers to "any person or persons." Persons may be either natural or artificial. [14 C. J., pp. 50-52.] The use of the words "any person" has been held to be broad enough to include artificial as well as natural persons. [State ex rel. Duniway, 63 Ore. 555, 128 Pac. 853.] The ordinance in question must be construed as a whole and we think, undoubtedly, it is broad enough to cover both natural and artificial persons, the latter including corporate entities.

Having been admissible against the corporation, the ordinance was properly admitted in evidence, even though it were not admissible as to Slatter, but undoubtedly, it was admissible as to him as well. In this connection defendant claims that since the train was operated

at an alleged excessive rate of speed, and that defendants failed to stop or slacken its speed, and this being the negligence upon which the case was submitted to the jury by plaintiff, Slatter was guilty of nonfeasance and not misfeasance and that, therefore, he was not individually liable.

Defendants cite the case of Lynch v. Missouri-Kansas-Texas Railroad Company, 333 Mo. 89, 61 S. W. (2d) 918. In that case, the Supreme Court had under consideration a statute, section 4756, Revised Statutes 1929 (Mo. Stat. Ann., par. 4756, p. 2133), providing that "said *corporation* (railroad) shall also be liable for all damages which any person may hereafter sustain at such crossing when such bell shall not be rung or such whistle sounded as required by this section." (Italics ours.) The court stated, 333 Mo. l. c. 104, 61 S. W. (2d) l. c. 925: "The statute restricts such liability to the railroad corporations alone."

Under our construction of the ordinance, it is not restricted to natural persons or to corporations, but includes both. Defendants are in error in urging that Slatter was guilty of nonfeasance. [Orcutt v. Century Bldg. Co., 201 Mo. 424, l. c. 447, 99 S. W. 1062, 8 L. R. A. (N. S.) 929.]

Defendants insist that the court erred in refusing to give their peremptory instruction in the nature of a demurrer to the evidence offered at the close of all of the evidence. In this connection it is urged that there is no competent evidence of a probative value that the ordinance was violated.

Plaintiff's witness, Duncan, testified that he was north of the crossing about three-fourths of a mile, just outside of the city limits, when he saw the train northeast of Slater Street approaching the city; that the next time he saw it it was at the Slater Street crossing; that the next time he saw it it was between Slater and Odell Avenue and the last time it was about half way between Odell Avenue and Jefferson Avenue; that he noticed the coach part of the train above the wheels as it passed between the building spaces about fifty feet in width; that he judged its speed to be forty miles per hour. He stated that it was 600 feet between Odell Avenue and Slater Street.

Plaintiff's witness, Barr, testified that he was at the corner of his house on Odell Avenue and about two-thirds of a block from the track when the train passed; that he was 175 feet from the track; that he saw the train approach Jefferson Avenue but he did not know the speed of the train when it got to the crossing there; that when he saw the train he was facing Slater Street; that it was running between thirty and thirty-five miles per hour; that he paid no attention to it after it passed Odell Avenue; that Odell Avenue is two blocks east of Jefferson Avenue.

The witness, Mistler, testified that he was in a grocery store on the north side of the railroad right-of-way about fifty feet east of the

crossing; that he looked out the window as the train passed and that the speed of the train, he would judge, was thirty-five miles per hour. "Q. Your estimate of the speed of the train is a mere guess, isn't it? A. I suppose it is."

Later, on cross-examination, he admitted that he signed a statement he had made previously, which he "guessed" to be true. In this statement he said: "I saw that train when it passed. I don't know anything about the speed of trains." It was for the jury to believe or disbelieve any part of the witness' testimony. [Gould v. Chicago B. & Q. R. Co., 315 Mo. 713, 290 S. W. 135.] Defendants' contention to the contrary is not well taken. The case cited on the question (Adelsberger v. Sheey, 332 Mo. 954, 59 S. W. (2d) 644) was where plaintiff relied entirely upon the testimony of one witness to prove a given issue. That is not the case here. There was evidence that the train proceeded at the same rate of speed from Odell Avenue to Jefferson Avenue. Therefore, the testimony, as to the rate of speed at which the train was proceeding at Odell Avenue and between that street and the Jefferson Avenue crossing, was sufficient for the jury's consideration on the question as to the rate of speed at which it was proceeding the whole distance from Odell Avenue to Jefferson Avenue. In addition to this, there is an inference that the train proceeded at the same rate of speed from the time it entered the city until it struck the truck. Consequently, testimony of its speed at any place between those points tends to show at what speed it was moving as it approched and at the time it arrived at the Jefferson Avenue crossing.

However, defendants insist that there was no evidence that the violation of the speed ordinance was the proximate cause of the collision. It is true that plaintiff's theory in reference to the violation of the ordinance is that the truck, consisting of the tractor and trailer, would have had time to cross over the railroad tracks and clear the train, had the ordinance been observed. In this connection defendants point out that the collision occurred as the front wheels of the truck came on to the south rail of the track on which the train was approaching. Defendants make a 'two page mathematical calcuation based upon the theory that the train was running at the rate of speed of thirty-five miles per hour, defendants claiming that the plaintiff, having alleged in her petition that the speed of the train was thirty-five miles per hour, could claim no other speed.

The petition alleges the violation of the speed ordinance, in that, the train was being driven "at a rate of speed in excess of fifteen (15) miles per hour, *to-wit*, at a rate of speed of thirty-five (35) miles per hour." (Italics ours.) "*Videlicet* is used frequently to show the express purpose of the pleader to leave the matters stated thereunder uncertain, and when a *videlicet* is followed by that which is immaterial and unnecessary, the matter so laid need not be strictly

54

proved. But it is only when matters alleged under a *videlicet* are not essential and material that the party is relieved from the necessity of proving them strictly. Material matters must be proved with equal strictness whether laid under a *videlicet* or not." [49 C. J., p. 813; Bradley v. Becker, 296 Mo. 548, .246 S. W. 561.] The material allegation in this instance was that the train was being operated in excess of the speed ordinance of fifteen miles per hour and any speed above fifteen miles per hour, whatever it might have been, would have been a violation of the speed ordinance. We think plaintiff is not conclusively bound by the statement in her petition that the speed of the train was thirty-five miles per hour.

There was sufficient testimony from which the jury coud have arrived at the conclusion that the truck and trailer would have cleared the track before being struck, had the train been operated at a.speed not in excess of the ordinance speed. Berry testified that when he approached within fifty feet of the track he looked east, along the south track, a distance of 178 feet. Actual measurements showed that when Berry approached within fifty feet of the track he could have seen no further than 178 feet along the said track toward the east. A photograph, appearing in the record, shows a curve in the railroad tracks, beginning at a point east of the Jefferson Avenue crossing, which may account for the fact that the track cannot be seen further to the east from the crossing than 178 feet. It was, of course, this 178 feet that the train traversed immediately before its front end on its south side struck the truck. When Berry looked east, after he emerged from behind the shrubbery, he was fifty feet from the track. The front end of the truck was seven feet, ten inches closer to the track than the driver, or it was forty-two feet, two inches from the track. The truck was going twelve miles per hour. The train was going thirty-five miles per hour (we will here assume this speed as there was evidence of that fact), or 2 11/12 times as fast as the truck. When the front end of the truck was 42 1/16 feet from the track the train, if traveling at thirty-five miles per hour, necessarily was 2 11/12 times 42 1/16 feet or 122.9 feet from the crossing. When the truck was 42 1/16 feet from the crossing it would have had to travel the following distances for the rear end of the truck to have crossed the track and cleared the train. The entire length of the truck or thirty feet, seven inches, the distances from the front end of the truck to the track or forty-two feet, two inches, the distance between the railroad tracks or four feet, six and one-half inches, the distance necessary to keep the overhang of the train from striking .the truck, or two feet six inches. These added together make a total distance of seventy-nine feet, eleven and one-half inches, that it was necessary for the truck to go when the front end of it was 42 1/16 feet from the truck in order to cross to a point of safety. If the train had been running at fifteen miles per hour, as provided by the

ordinance, it would have run one and one-fourth times the distance that the truck would have gone at twelve miles per hour. So while the truck was running seventy-nine feet, eleven and one-half inches the train would have run one and one-fourth times seventy-nine feet, eleven and one-half inches or 99.7 feet.

As above stated, the train was 122.9 feet from the crossing when the front end of the truck was 42 1/16 feet therefrom. The train, if it had been running only fifteen miles per hour, would have run only 99.7 feet,while the truck was clearing the crossing. Deducting 99.7 feet from 122.9 feet leaves 23.2 feet, which would be the distance that the train would have been east of the crossing at the time that the truck would have entirely cleared the crossing, if the train had been running fifteen miles per hour.

However, as hereinafter pointed out, the operators of the train could have seen the top of the trailer before the front end of the truck came out from behind the shrubbery. If the operators of the train had been looking when the train was 178 feet from the crossing they could have seen the trailer when the front end of the truck was fifty-nine feet from the crossing, as the train, going thirty-five miles per hour, was traveling approximately three times as fast as the truck. While the assumption of these facts would require the truck to traverse a somewhat greater distance to clear the track then shown by the other calculation above, yet it would put the train much further away from the crossing at the time the question of speed became material as a proximate cause of the collision; and had it been going at a rate of speed of fifteen miles per ·hour it would have been much further away from the crossing (approximately ninety-one feet therefrom), when the truck cleared.

There was evidence that the train was going thirty miles per hour. At that speed it went two and one-half times as fast as the truck and when the train was 178 feet away from the crossing the front end of the truck was approximately seventy feet from the crossing and the entire truck had approximately 108 feet to go to clear it. If the train had been going fifteen miles per hour it would have gone 135 feet while the truck was passing over a space of 108 feet. Deducting the 135 feet from the 178 feet, leaves forty-three feet which would have been the distance the train would have been east of the crossing at the time the truck entirely cleared the crossing.

Plaintiff makes a calculation different from that contained in defendants' brief, based on the theory that the train was going at the rate of thirty-five miles per hour and states: Plaintiff "accepts thirty-five miles per hour as the rate of speed of the train." Defendants say that plaintiff admits, in her brief, that the train was going thirty-five miles per hour. Of course, if a party makes an unequivocal admission in this court as to the state of the record we could, no doubt, accept it as a judicial admission, and conclusive, regardless

as to what the record actually showed. However, in another brief filed by plaintiff, after the filing of her original brief, she makes it clear that she does not intend to make any such admission. We do not think that plaintiff has been concluded in this matter by anything said in the briefs.

However, defendants urge that Berry, the driver of the truck, was guilty of contributory negligence, as a matter of law, and his negligence is to be imputed to deceased because the three occupants of the truck were on a joint journey. The doctrine of joint venture has no application in this case. The cattle did not belong to deceased. Berry testified to the effect that he had sole control over the truck. Deceased was merely helping Clough, who had procured Berry, the latter being in the business of transporting live stock for hire, to haul cattle. Deceased did not own the steers, was not driving the truck and had no control or right of control over its operation. [Herrell v. St. Louis-San Francisco Ry. Co., 324 Mo. 38, 23 S. W. (2d) 102, 69 A. L. R. 470.]

If the train was going either thirty or thirty-five miles per hour, and any speed less than fifty miles per hour, Berry saw it when he looked as he emerged from behind the shrubbery, if he looked carefully. He said that he looked when the front end of the truck was 42 1/6 feet from the crossing. The truck was going twelve miles per hour. If the train was going thirty miles per hour it was proceeding two and one-half times as fast as the truck and was 105 feet, five inches from the crossing when Berry was 42 1/6 feet therefrom. If the train was going thirty-five miles per hour it was proceeding approximately three times as fast as the truck and was approximately 126½ feet from the crossing when the truck was 42 1/6 feet therefrom. Consequently, when Berry says that he looked as he came out from behind the shrubbery and saw 178 feet east along the track and saw no train, he was mistaken and his testimony will not be accepted as true because contrary to the physical facts, as there is no claim made in this court that the train was proceeding at the rate of fifty miles per hour. If it was going that fast then there arises a question as to whether it is a physical impossibility to stop in 140 feet a train going fifty miles per hour. In view of our conception of the record we need not go into that question.

It may be assumed that deceased looked when Berry did and saw the train 105 feet, 5 inches from the crossing. Was deceased guilty of contributory negligence, as a matter of law, because he said nothing to Berry, the driver of the truck at that time? We think not. Berry had only 42 1/6 feet in which to have stopped before the front end of his truck entered upon the first rail of the track and it required forty-five feet for him to stop. The failure of deceased to warn Berry could not have contributed as a proximate cause of the collision. Berry may have been guilty of contributory negligence, as a

matter of law, in approaching the crossing at such a rate of speed that he could not stop when he arrived at a point where his view was no longer obstructed, but Berry's negligence cannot be imputed to deceased, and deceased cannot be adjudged, himself, guilty of such negligence in not remonstrating with Berry over the speed the latter was driving in approaching the crossing, because there is no evidence that deceased knew that it would require forty-five feet to stop the truck. It was not any ordinary automobile. Deceased was a guest. "It was the truck driver's statutory duty to use the highest degree of care (Sec. 7775, R. S. 1929 (Mo. Stat. Ann., par. 7775, p. 5197); whereas the rule in this State is that a guest is required to exercise only ordinary care, reasonably relying on the vigilance of the chauffeur. [Buehler v. Festus Mercantile Co., 343 Mo. 139, 149 (2), 119 S. W. (2d) 961, 964 (2) . . .]'' [State v. Shain, 143 S. W. (2d) 233.]

"In Boland v. St. Louis-San Francisco Ry. Co. (Mo.), 284 S. W. 141, 144, speaking of the liability of a guest for the negligence of the driver, this court said: 'She was merely his guest. It is entirely clear therefore that no act of his was attributable to her as a matter of law. If she expressly approved or sanctioned anything he did there is not the slightest intimation of it in the evidence. On the whole it is fairly inferable that she assumed no responsibility of any kind, but left the control and management of the machinery entirely to the driver. . . . Yet it is a matter of common knowledge that under ordinary circumstances such occupants do largely rely upon the driver, who has the exclusive control and management of the vehicle, exercising the required degree of care, and for that reason courts are not justified in adopting a hard and fast rule that they are guilty of negligence in doing so. . . . She evidently assumed that the driver would take these precautions. Was she negligent in so doing? Was she negligent in not protesting against his starting across the tracks before they could obtain an unobstructed view to the west? These, we think, are questions for the jury.' [See, also, Peterson v. St. Louis Transit Co., 199 Mo. 331, 341, 97 S. W. 860, 869.]''

Deceased was not bound, as a matter of law, to know in what distance the truck might be stopped. Whether or not deceased's conduct in failing to caution the driver, or to remonstrate against the rate of speed and manner of driving renders him guilty of contributory negligence, was a question for the jury and not one of law under the facts in this case. [State ex rel. Alton Railroad Company v. Shain, *supra*.]

Plaintiff, not only made a case under the speed ordinance, but, also, under the humanitarian theory. [State ex rel. Alton R. R. Co. v. Shain, *supra*.] In this connection defendants insist that the view of the operators of the train was obstructed to the same extent as that of Berry and the occupants of the truck, and more, in that the radiator

extended out in front of the train window from which the operators of the train were looking. Defendants say that this radiator extended thirty inches. There was evidence to that effect, but also to the effect that it was only twenty-four inches. So in considering the demurrer to the evidence we must accept the testimony showing twenty-four inches.

Plaintiff was not bound by the testimony of the operators of the train that they could not have seen the truck until the moment of the collision. There was evidence that the truck approached the crossing at an obtuse angle and that the operators could have seen down Jefferson Avenue to the south further than had it approached at right angles. The front end of the train was not the conventional type steam engine where the boiler extends far out in front of the engineer, but the operators of this train were seated near the front end. Having approached the crossing at an obtuse angle, the jury could have found that they could have seen a point down Jefferson Avenue seventy feet or more from the crossing.

However, defendants say: "Assume, for the sake of argument, that the train engineer did see the front end of the truck at this point, what was his duty, under the circumstances? The evidence of plaintiff disclosed that the truck was then moving at a uniform speed of twelve miles per hour, which was a slow speed. There was nothing then to indicate to the engineer that the truck would not stop before it came within four or five feet of the track, a place of safety, and stop to let the train pass. Berry, himself, testified that had he seen the train he would have stopped twenty or twenty-five feet from the track. The engineer was not required to be a mind reader and there was nothing requiring him to take action to stop the train."

In this connection defendants cite Neill v. Alton R. Co. (Mo. App.), 113 S. W. (2d) 1073. In the Neill case plaintiff had an unobstructed view of the railroad track when he approached it from a point 165 feet away. He was seated in a truck approaching the crossing at a slow speed. The train was running at a speed of twenty-five to thirty miles per hour. In the opinion in that case the court said, 113 S. W. (2d) l. c. 1075:

"No one would contend that he was in the danger zone during the whole of the distance of 165 feet, since at the slow speed at which he was concededly traveling his truck could undoubtedly have been stopped in a comparatively short distance, and the engineer would have been entitled to assume that he would not go upon the track ahead of the train until such time as he had approached so close to the track that a contrary intention was manifest."

"Now the danger zone, within the contemplation of the humanitarian doctrine, *is a zone whose limits vary with the facts of each particular case,* and is reached at the moment that the plaintiff approaches so near the ultimate point of the collision, and under such

circumstances, that it is or should be reasonably apparent to the defendant or his servants that the plaintiff *either cannot or will not stop or change his course before* coming into the defendant's path." (Italics ours.)

The rule laid down in the Neill case is flawless but it clearly appears that the facts in that case are unlike those in the case at bar. While, in this case, the truck was approaching the track at a rate of speed of twelve miles which, under some circumstances, might be a comparatively slow rate of speed, yet, under the conditions present, all of which the jury could have found the operators of the train knew (they having testified that they were looking), it was not necessarily slow in the sense that it indicated to them that the truck would not go upon the track. In this case there was evidence tending to show that the truck could not have been stopped within less than forty-five feet. This was caused, no doubt, by reason of the fact that the street was covered with ice and snow and it was slick. The conditon of the slick street was clearly apparent and known to the operators of the train. The jury could have reasonably found that, seeing the ice, snow and slickness of the street present, the uniform speed of the truck and the view of the occupants thereof was obstructed, the operators of the train should have concluded that the truck would not stop when it was seventy feet or more away from the crossing. Under the humanitarian doctrine the "position of peril" is one of the basic facts of liability, it might be determined the chief one. It is neither necessary to plead nor submit to the jury obliviousness or inextricability. [Perkins v. Terminal R. Association, 340 Mo. 868, 102 S. W. (2d) 915, 921.]

In Tannehill v. Railroad Company, 279 Mo. 158, 213 S. W. 818, cited by defendants, the train at the rate of speed it was running could not have been stopped in less than 400 to 600 feet and the train crew could not have seen the automobile, which the train struck, for a greater distance than 200 feet. That case, of course, is not in point. The court said, 279 Mo. l. c. 173, 213 S. W. l. c. 822:

"If it be in fact a duty incumbent by law upon a defendant railroad to stop its trains whenever those in charge thereof see an automobile within forty or fifty feet of a railroad crossing, and running only five or six miles an hour, it would require in many cases three or four days for a train to cross this State."

This statement of the court was not made in view of any obliviousness or the inability to stop on the part of the person injured. We think this case clearly not in point.

Defendants also cite, in connection with the ability of the operators of the train to stop it, Kick v. Franklin, 342 Mo. 715, 117 S. W. (2d) 284, 288, where the court said:

"From all of the evidence on the point, it is fair to say that at least two seconds would elapse from the time the engineer could visualize

the situation, apply the brakes, and the brakes become effective. In these two seconds the train moved 120 feet, and is within 149 4/9 feet of the point of impact. And in these 2 seconds the rear of plaintiff's car, most favorably stated, has moved forward nine feet, and yet has to go forward eleven feet, two and one-inches in order to clear. There is no substantial evidence, in this situation, that the speed of the train could have been so slackened as to permit the car to clear.''

The Kick case was not decided on any testimony as to in what distance the train was actually stopped. Such a matter was neither discussed or mentioned. Here, the evidence shows that the train was actually stopped within 140 feet. Aside from this, there is nothing to show that the trains in the two cases are at all comparable as to length and weight. In Hoelzel v. Chicago R. I. & Pac. Ry. Co., 337 Mo. 61, 85 S. W. (2d) 126, 131, the Supreme Court accepted expert testimony that a train running thirty to thirty-five miles per hour could have been stopped within a distance of 125 feet. Defendants quote the following from McGee v. Wabash R. Co., 214 Mo. 530, 114 S. W. 33, 36:

.''Courts being eminently practical tribunals in getting at practical and just results in the affairs of men, will it do to chop logic and predicate actionable negligence on subtle reasoning involving metaphysical features and covering an interval of half a second or one or two seconds of time? We think not. Therefore, to get to the jury, plaintiffs must get their case out of the fog of conjecture and plant it on a basis of fact.''

This observation was made in a case where the facts make it applicable. The facts in the McGee case are not at all like those in the case at bar.

What has been said by the courts in reference to stopping ordinary trains, some of which consist of many cars with a heavy locomotive, does not necessarily govern this case. This was not an ordinary train but was composed of two passenger cars. In the front end of the forward car was located the machinery for the operation of the train. There is no evidence as to the weight of these cars. They were evidently equipped with modern air braking devices. They could have constituted a very light train, and we cannot say they could not have been stopped in a shorter distance than an ordinary heavy train consisting of a locomotive and many cars. However, defendants point out that the operator of the train, who testified that the train actually was stopped within 140 feet, also, testified that the train was going only fifteen miles per hour. The jury was not required to believe this testimony as to its rate of speed. It could have rejected it; but it accepted defendants' testimony as to the distance in which the train was actually stopped and accepted plaintiff's testimony as to its rate of speed, to-wit thirty or thirty-five miles per hour. [Gould v. Chicago B. & Q. R. Co., *supra.*] Of course, we do

not mean to say that a jury is allowed to piece together parts of the testimony of various witnesses and therefrom arrive at a conclusion contrary to natural laws. But, at least, in the absence of a more detailed description of the train involved in this case, there was no physical facts presented. [See Steger v. Meehan (Mo.), 63 S. W. (2d) 109, 110.]

As before indicated, there was evidence from which the jury could have found that the operators of the train saw the trailer traveling at a uniform rate of speed, giving no indication that it was going to stop prior to the time the front end of the truck came past the shrubbery. It gave no indication, after it came out in front of the shrubbery, that it would stop. The jury could also have found that, if the operators of the train saw this, they also saw that the position of the driver of the truck was such that he could not see on account of the shrubbery. Berry's testimony as to the distance which he could have seen in view of the shrubbery was based upon measurements that he made in October, 1935, which he made in conjunction with plaintiff's witness, Wilhite.

Wilhite testified that the shrubbery at that time was six to eight feet high. The evidence shows that the trailer was ten feet, four inches in height. From this, the jury could say that the top of the trailer could have been seen by the operators of the train even before it reached a point fifty feet from the track. While the testimony of Wilhite as to the height of the shrubbery was as to its height nearly a year after the collision, Berry testified that some pictures taken at the time Wilhite viewed the situation were a fair representation of the situation at the time of the collision. From this testimony the jury could have found that these pictures showed the crossing and the particular condition existing, including the shrubbery. There was, therefore, evidence from which the jury could say that the shrubbery was in the same condition, at the time Wilhite saw it, as it was in at the time of the collision.

The Supreme Court, in the Hoelzel case, *supra, where there was no direct evidence* that the truck involved in the collision could have been seen from the train above the obstruction which obscured the view of the driver of the truck on motion for rehearing, said (85 S. W. (2d) l. c. 135):

"It might well be that the embankment covered with drifted snow obstructed plaintiff's view of the train, but did not, on account of the fireman's elevated position, and on account of the fact that the truck was much closer to the embankment than the train was, obstruct his view of at least the top of the truck as it approached the track. We would not be justified in holding otherwise, as a matter of law. We did not discuss this question in the opinion, hence this memorandum on the point. Other points presented in the motion do not present any reason for rehearing."

In the case at bar there was evidence that the top of the trailer could have been seen before the truck arrived at a point fifty feet from the track.

Some discussion is had in the briefs as to the danger zone in this case, defendants claiming that it was four or five feet from the track. Of course, the danger zone depends upon the facts in the particular case. [Womack v. Missouri Pac. R. Co., 337 Mo. 1160, 88 S. W. (2d) 368, 372; Perkins v. Terminal R. Ass'n of St. Louis, 340 Mo. 868, 102 S. W. (2d) 915, 923.] In Crews v. Kansas City Pub. Serv. Co., 341 Mo. 1090, 111 S. W. (2d) 54, 58, it was held that the danger zone could widen to more than 100 feet. In Werndle v. St. Louis-S. F. Ry. Co. (Mo. App.), 67 S. W. (2d) 810, it was held that a truck when between fifty and sixty feet of the crossing was in the danger zone. In Homan v. Mo. Pac. R. Co., 334 Mo. 61, 64 S. W. (2d) 617, 624, it was held that a bus driver was in the danger zone when he was 100 feet from the crossing. In Womack v. Mo. Pac. R. Co., *supra*, it was held that an automobile going five miles per hour was in the danger zone when it was sixty feet from the crossing. In Herrell v. St. Louis-S. F. Ry. Co., 322 Mo. 551, 18 S. W. (2d) 481, 485, 486, the Supreme Court held the danger zone to be fifty feet from the crossing.

In view of the fact that the street was covered with ice and snow and was slick, that the truck could not have been stopped in less than forty-five feet, that the operators of the train could have seen that the view of the occupants of the truck was obstructed by the shrubbery, and that the truck continued on at a uniform rate of speed giving no evidence that it was going to stop, it was a question for the jury to determine whether the truck was in the danger zone when it was seventy feet from the track. The fact that Berry said that he would have stopped in twenty or twenty-five feet had he known that there was a train approaching has little bearing on the matter. Not knowing of the approach of the train he got into a position where it took forty-five feet in which to stop. The operators of the train could have seen the obstruction of the shrubbery; that the street was covered with ice and snow, and that the truck gave every indication that it was not going to stop.

It is insisted that because plaintiff did not submit failure to warn as pleaded in her petition that she, in effect, admitted that a warning was given of the approach of the train. We do not consider the effect of failure to instruct on a given charge of negligence when we are disposing of the question of a demurrer to evidence. [Schroder v. Wells, 310 Mo. 642, 276 S. W. 60.]

It is insisted that the court erred in giving plaintiff's Instruction No. 5, predicating recovery upon a violation of the speed ordinance. In this connection it is urged that its peremptory instruction in the nature of a demurrer to the evidence should have been given; that there is no competent evidence of probative value that the ordinance

was violated; that there is no evidence that the violation of the speed ordinance was the proximate cause of the collision. From what we have already said in discussing other points, there is no merit in the ones now advanced. Some of the testimony of the witnesses, on the part of the plaintiff, is not as satisfactory as one· would desire, still, whether or not it was to be accepted by the jury, was a matter for its consideration. The lack of ability of some witnesses to see fully is a matter involving the weight to be given their testimony; and it is not for this court, as a matter of law, to reject it in its entirety.

The instruction is complained of because it assumes that the ordinance was in force. The ordinance was certified in accordance with the statute. There was no dispute at the trial about its certification. It has been held that it is improper to submit such a matter to the jury. [Henry v. Ill. Cent. R. Co. (Mo.), 282 S. W. 423, 424.]

It is also contended that the instruction was erroneous in that it told the jury that the negligence of Berry "would constitute no defense in this action." The instruction tells the jury that if deceased was in the exercise of ordinary care, then the jury should return a verdict in favor of plaintiff, provided certain other facts in the instruction were found, even though Berry, the driver of the truck, was guilty of negligence in driving up to and on to the track, if they found "that such negligence of the driver of the said truck, if any, combined with the negligence of the defendants, Alton Railroad Company and W. L. Slatter, above mentioned, if you find they were so negligent, so as to directly injure and cause the death of the deceased, Brown, if you·so find, as under the laws of this State, and under all the circumstances set forth above (if you so find them to be shown by the evidence) any act of negligence, or want of care on the part of the driver of said truck in driving said truck into the path of said train would constitute no defense to the defendants in this action."

It is well settled that if a person was negligent and his negligence was the proximate cause of the injury, he is liable for the injury, although his negligence may not have been the sole proximate cause of the injury and even though his negligence without that of a third party intervening would not have caused it. [Christiansen v. St. Louis Publ. Serv. Co., 333 Mo. 408, 62 S. W. (2d) 828, 830.] The instruction specifically states that the jury must find, before they could find that any negligence on the part of the driver of the truck would not constitute a defense, that the negligence of the driver *combined* with the negligence of the defendants "so as to *directly* injure and cause the death of deceased." We think there was no error in the giving of the instruction. [State ex rel. Alton R. Co. v. Shain, *supra.*]

However, it is claimed that "In addition the instruction was improper, confusing and misleading in its endeavor to inform the jury

as to what 'would constitute no defense to the defendants.' This we submit had no proper place in the instruction, and was prejudicial and so intended. The instruction was definitely confusing, and argumentative and assumed controverted facts. [Roshel v. Railroad Company (Mo. App.), 112 S. W. (2d) 876.] If the acts of negligence Berry amounted to the sole cause, then, in any event, the same would be a defense to the defendants on this issue of alleged primary negligence of alleged violation of the alleged speed ordinance and this feature should be considered in connection with the refusal of defendants' requested instructions, covering the theory of sole cause, and also all the more reason for the court giving these instructions, instead of refusing them. The last ten lines of this instruction were prejudicial in that they were at least misleading to a jury, and certainly led the jury to believe that no matter what the act of negligence was of Berry, the driver of the truck, the same would 'constitute no defense to the defendants.' Such, we believe, is not the law.''

This is the only mention made in the briefs of appellants in regard to this matter and it thus appears that the only ground upon which they are contending that the instruction was confusing and misleading is that the jury was lead to believe that no matter what the act of negligence was on the part of the driver of the truck the same would constitute no defense to defendants. While this part of the instruction could be better phrased, we do not think that it would lead a jury to so believe. As before stated, it requires the jury to find that the negligence of the driver of the truck *combined* with the negligence of the defendants ''so as to *directly* cause the death of deceased.'' It was only the acts of negligence of the driver of the truck that combined with the negligence of the defendants to directly cause the death of deceased that were to be eliminated by the jury in considering his negligence.

It is insisted that the instruction was improperly given for the reason that deceased was guilty of contributory negligence as a matter of law. As we have before indicated, there is no merit in this contention. [See State ex rel. Alton R. Co. v. Shain, *supra*.]

Defendants insist that the court erred in giving plaintiff's Instruction No. 6, predicating recovery by plaintiff against defendants on the humanitarian theory of stopping the train or slackening the speed thereof. Plaintiff's Instruction No. 6 is quite lengthy and it would serve no useful purpose to further prolong this opinion by setting it out in full. In its first part it tells the jury ''That if you find and believe from the evidence that the place where the train struck and collided with the truck mentioned in evidence was within the corporate limits of the city of Marshall and at or near a point where a traveled public street and highway (known as Jefferson Avenue) crossed and ran over the railroad track on which said train was being operated, then, under the law, it became and was the duty

of defendants in running and operating said train up to and over said crossing to exercise ordinary and reasonable care to look out for, and to exercise ordinary and reasonable care to discover the presence and near approach of persons and vehicles on or near and about to go upon said track and to use ordinary care to prevent the injury of any person thereon or thereat and that a failure to perform this duty, if you believe from the evidence there was such failure is negligence as a matter of law.'' The instruction then submits the necessary facts to authorize recovery under the humanitarian theory, including ''imminent danger and peril'' of deceased and his obliviousness, and then directs a verdict in favor of the plaintiff, if the jury found such facts to be true. The instruction then concludes with the following language: ''and this you will do even though you should further find that the driver of said truck and the deceased Brown at the times in question were negligent as under the law of this State *and all the circumstances above set forth* (if you so find them to be shown by the evidence) any act of negligence or want of care on the part of either the driver of said truck or the deceased in approaching or going onto said track would constitute no defense whatever to the defendants Alton Railroad Company and W. L. Slatter *upon the issues submitted in this instruction.*'' (Italics ours.)

Defendants first say that this instruction is erroneous for the reason that there was no evidence upon which to base negligence of the defendants in failing to slacken the speed of the train; that the only way the slackening of the speed of the train would have prevented the collision was for it to have been sufficiently slackened to have allowed the truck to pass in safety over the track ahead of the train. The jury could have found from the evidence that the operators of the train could have seen the truck as it approached the track and seventy feet therefrom, at which time the train was 178 feet from the point of the collision. There was evidence that the train was actually stopped in 140 feet. When the operator of the train saw the truck approaching the track, apparently with the intention of passing over the same, the jury could have believed that they could have stopped the train thirty-eight feet east of the point of collision. However, in stopping a train within 140 feet, it would have been naturally slowed down some even while it was passing over that distance. In the meantime the truck also would have moved more than seventy feet nearer the track and had a much less distance than 108 feet to traverse after the train reached the said thirty-eight foot point. It is quite apparent that if the train, instead of stopping, had slowed down and, after it had reached a point thirty-eight feet from the place of the collision, it had been further slowed down, say to five miles per hour, the truck would have cleared the train and would have gone several feet beyond.

In this connection, defendants again cite the case of Kick v. Franklin, *supra*. That case is unlike the case at bar. The facts shown in the two cases are different and, as we stated before, in discussing the Kick case, there is no evidence in that case in what distance the train was actually stopped and there is nothing to show that the train there involved is at all comparable to the one involved in the case at bar, as to size and weight. It is quite apparent that the facts in the Kick case, as far as disclosed, are wholly unlike those in the case at bar.

It is insisted that there is no evidence to warrant submission to the jury of the issue of the stopping of the train. We have already passed upon this point in connection with the discussion of the demurrer to the evidence.

It is insisted that the first part of the instruction, which we have copied above, is an abstract proposition of law; that it is improper and prejudicial in this case, in that it tended to mislead the jury. As before stated, the first part of the instruction is followed by sufficient facts to authorize a verdict in favor of plaintiff under the humanitarian rule and there was clearly no reversible error committed in including the part of the instruction complained of by defendants. [Hoelzel v. Chicago, R. I. & Pac. Ry. Co., 337 Mo. 61, 85 S. W. (2d) 126, 130; See, also Brolin v. City of Independence, 232 Mo. App. 1056, 114 S. W (2d) 199; Bales v. Kansas City Pub. Serv. Co., 328 Mo. 171, 40 S. W. (2d) 665.]

It is claimed: ''The last part of the instruction also improperly featured the negligence of the driver of the truck and of deceased Brown. This reference to their negligence informing them that the same constituted 'no defense whatever to the defendants,' was improper, confusing, misleading and argumentative to the jury and particularly in the form put in the instruction. The attempt to qualify it by the use of the words thereafter 'upon the issues submitted in the instruction,' is certainly misleading to a lay jury. Was the issue referred to in the first paragraph of the instruction, which we have heretofore critised under the previous paragraph, or what was it? It was prejudicial and so intended. The instruction was too involved, to be understood by the jury and was definitely confusing, and assumed controverted facts. [Roshel v. Railroad Co. (Mo. App.), 112 S. W. (2d) 876.] ''

It will be seen, by an examination of the language just quoted from defendants' brief, that the only way in which it is pointed out with any clarity that the instruction was improper, confusing, misleading, argumentative, involved and that it assumed controverted facts, is that the jury might have considered the language 'no defense whatever to the defendants upon the issues submitted in the instruction'' as referring to the first paragraph of the instruction. It is quite apparent that the language used refers to the whole in-

struction. We have examined the case of Roshel v. Railroad Company, *supra*, cited by defendants, and find nothing therein to aid us in passing upon this question.

In their reply brief defendants say that the language used is prejudicial because it "injects into the case on a humanitarian instruction, the feature of contributory negligence, which is improper, not only as to a plaintiff, but as to a defendant." It would appear that the instruction is a proper one. [Pence v. Kansas City Laundry Serv. Co., 332 Mo. 930, 59 S. W. (2d) 633, 638.] In that part of the instruction before the portion last quoted every essential is submitted to be found by the jury which would make defendants' negligence at least a proximate cause of the death of deceased. It is true that it is error to inject in a humanitarian instruction, the features of contributory negligence for the purpose of defeating recovery. [Brown v. Wheelock (Mo.), 83 S. W. (2d) 911.] However, it is not improper for plaintiff's instruction to submit, in proper form, contributory negligence as not being a defense. [See Pence v. Kansas City Laundry Serv. Co., *supra*.] In Brown v. Wheelock, *supra*, cited by defendants it is held to be error to allow the jury to consider primary negligence of the plaintiff in a humanitarian instruction. That was not done in the case at bar.

Defendants also urge that the giving of said Instruction No. 6, above set out, constituted reversible error because, it is said, the last paragraph thereof (commonly referred to as the tail) violates the rule announced in Smithers v. Barker, 111 S. W. (2d) 47, l. c. 53, and in other similar cases. This contention was not raised by defendants upon either of the former occasions when the cause was submitted in this court, and was not considered by the Supreme Court when the case was there on *certiorari*. [State ex rel. Alton R. R. Co. v. Shain, *supra*.]

Smithers v. Barker, *supra*, was a case considered by the Supreme Court on *certiorari* from this court. There the court considered a humanitarian instruction which had attached to it a "tail," said "tail" being as follows:

"And you are further instructed, this is so, even though you should find and believe from the evidence, that plaintiff did not exercise due care for his own safety, and was, or was not, then and there drunk and negligent, in getting himself into the aforesaid position of imminent peril, if any, at said time and place."

Our record in that case was not quashed because of our ruling on the *above mentioned question*; but the language used in the "tail" of the instruction was condemned for two reasons: first, because the language was too broad; and, second, because that portion of said instruction was so worded that it would have conflicted with any proper "sole cause" instruction, had one been asked or given. The court held that the facts in evidence in that case clearly established

that a "sole cause" issue existed. [Smithers v. Barker, *supra*, l. c. 53.]

In Crews v. Kansas City Pub. Serv. Co., 111 S. W. (2d) 54, l. c. 59, the Supreme Court held that the language used in the "tail" of the humanitarian instruction there given was not as broad as that used in the Smithers case; but the opinion does not hold that the instruction was not erroneous for that reason, although it would seem that the author of the opinion had such a thought in mind. The instruction was declared to be a proper one because, it was held, there was no "sole cause" issue involved in the case.

We think that an "even though" clause in a humanitarian instruction is not erroneous in a case where there is no real "sole cause" issue involved; and that where such an issue is in the case an "even though" clause must be limited, by appropriate language, so that it would not conflict with a correct "sole cause" instruction. If it is so limited we think it is proper in such a case. [Melenson v. Howell, 130 S. W. (2d) 555, l. c. 561.]

The purpose of the "even though" clause is to completely exclude the application of the doctrine of contributory negligence in a humanitarian case. [Melenson v. Howell, *supra*.] Of course a humanitarian instruction really accomplishes this purpose without the addition of such a "tail." Nevertheless, the "tail," in a proper case and when properly worded, is permissible. [Crews v. Kansas City Pub. Serv. Co., *supra*; Melenson v. Howell, *supra*.]

The only question remaining for discussion on this instruction, then, is: Was the "tail" of this instruction so limited by the language used as to prevent a conflict with a proper "sole cause" instruction if one had been submitted? We think it was. (For the purpose of this discussion we will assume that there was a real "sole cause" issue in the case.)

In Pence v. Kansas City Laundry Company, 59 S. W. (2d) 633, l. c. 638, the Supreme Court considered a humanitarian instruction which possessed a "tail" similar to that under discussion here, and said:

"Counsel for appellant also say that above Instruction 5 was erroneous in permitting the jury to find for plaintiff 'under this particular instruction, even though you should believe from the evidence that Mrs. Pence failed to use ordinary care for her own safety and that both Dr. and Mrs. Pence were careless in getting into the position they were in at the time of the collision.' Plaintiff's contributory negligence is not a defense in a case made under the humanitarian rule (Burke v. Pappas, 316 Mo. 1235, 293 S. W. 142, 145; Schulz v. Smercina, 318 Mo. 486, 1 S. W. (2d) 113, 120; Thompson v. Quincy O. & K. C. R. Co. (Mo.), 18 S. W. (2d) 401, 404, 405), but as this defense was available in the submission of other grounds of negligence herein, it was proper to call attention in this instruction

to its non-applicability under this theory of the case. For this very reason it was appropriate to limit a verdict on such theory to findings 'under this particular instruction.' "

It will be noted that the "tail" in the Pence case was limited in its application to the issues "under this particular instruction." The "tail" in the case at bar was limited "upon the issue submitted in this instruction." The cases, the one at bar and the Pence case, were submitted on primary negligence and humanitarian negligence. The limiting words left no room for the jury to be misled as to the application of the terms of the humanitarian instruction, or any part thereof, to any issue that might exist under other instructions. The Pence case was decided before lawyers of courts had evolved the theory of "sole cause," yet the Pence case is still the law. We hold that the giving of the instruction in the form in which it was given was not error.

Defendants insist that the court erred in refusing to give their Instructions Nos. 15, 16, 17, 18 and 19, which sought to tell the jury, in effect, that if the driver of the truck was guilty of negligence and this was the sole cause of the collision between the truck and the train, then the verdict of the jury must be in favor of defendants. None of these instructions, in any way, submits that the negligence of the driver could not be imputed to the deceased, or the passengers in the truck, and the collision be not due to the negligence of the defendants. [Decker v. Liberty (Mo.), 39 S. W. (2d) 546, 548; Doherty v. St. Louis Butter Co., 339 Mo. 996, 98 S. W. (2d) 742; Peppers v. St. Louis-San Francisco Ry. Co., 316 Mo. 1104, 295 S. W. 757, 761.] In Dilallo v. Lynch, 340 Mo. 82, 101 S. W. (2d) 7, l. c. 13, it is stated:

"If a humanitarian defense instruction is to have recognition in the practice, then when a cause is submitted under primary negligence and the humanitarian rule, such instruction should in order to avoid confusion and conflict, contain the *sole* cause provision and what we may term a *not due* to the negligence of the defendant provision as in the Doherty case, and also a plain direction that contributory negligence is not to be considered in determining recovery under the humanitarian rule. In cases where a guest sues to recover for injuries sustained in a collision of automobiles and where defendant makes the defense that the cause of the collision was due *solely* to the negligence of a third party, the *sole cause* instruction of the defendant must 'clearly advise the jury that the negligence, if any, of the third party cannot be imputed to the plaintiff.' "

In Doherty v. St. Louis Butter Company, *supra*, 98 S. W. l. c. 745, cited by defendants on this point, the "sole cause" instruction submitted by defendant also contained a clause that the jury must find that the injury "was not due to any negligence on the part of the operator of the truck mentioned in the evidence in any particulars

set out in other instructions." Defendants' instructions contain no such clause or other clauses as suggested in the Dilallo case.

It is insisted that the trial court erred in admitting evidence of the fifteen-mile speed ordinance and in refusing defendants' instructions withdrawing the same from the consideration of the jury.

We have already held that this ordinance was properly admitted in evidence and we need not discuss the matter further at this time.

Defendants also urge that "submitting to the jury the questions of stopping or slackening the speed of the train, as done in plaintiff's Instruction No. 6, disputed the allegations of plaintiff's petition which was binding and conclusive on plaintiff and rendered impotent and insufficient, the allegation made in the petition under the humanitarian theory, so that it was improper to submit the same." This point was not supported in defendants' brief by any cited authorities when the cause was submitted. This court and the Supreme Court have heretofore held that, under such circumstances, an assignment of error is not reviewable. [Murphy v. Fidelity Bank & Trust Co., 49 S. W. (2d) 668, l. c. 671; Jones v. Peterson, 72 S. W. (2d) 76, l. c. 83.]

It is insisted that the court erred in permitting counsel for plaintiff to argue to the jury as follows: "Under the law of this case it will be necessary in your verdict, if you find for the plaintiff, for you to return a verdict, not against the railroad or Slatter alone, but it must be against both of them, and any other verdict would be fatal. MR. MILLER: We object to that as improper argument. THE COURT: Overruled."

The objection made to the argument was insufficient to preserve any point in reference to it. [Murphy v. Fidelity Nat. Bank & Trust Co., 226 Mo. App. 1181, 49 S. W. (2d) 668, 671.]

However, the ground upon which defendants in their brief base the point that the argument was prejudicial is that the speed ordinance does not apply to either the defendant company or to Slatter and, not to Slatter, because his act in failing to slow down, the train was nonfeasance. We have already ruled that there is no merit in what defendants say in reference to this matter. [Orcutt v. Century Bldg. Co., *supra.*]

It is urged that the court erred in admitting, over the objection of defendants, the testimony of Duncan and Mistler as to the speed of the train when it was east of the Jefferson Avenue crossing, for the reason that these witnesses were not qualified to give an opinion as to the speed of the train.

Duncan testified that he had ridden quite often on trains, had seen them often, had observed the speed of trains in a general way, but that he had not timed them and that his statement with reference to the speed of trains could to some extent, be a guess; that he was

familiar to some extent, in a general way, in judging the speed of trains "as they go along."

Mistler testified that he had ridden on trains quite often. Some of the testimony of Mistler, which defendants urge shows that he was unqualified, was brought out long after defendants' objection was made to his testifying and no motion then was made to strike out the testimony. There is no question but that these witnesses were competent to give their estimates of the speed of the train and the weight to be given their testimony was for the consideration of the jury. [Walsh v. Mo. Pac. Ry. Co., 102 Mo. 582, 586, 14 S. W. 873, 15 S. W. 757.]

We have examined Priebe v. Crandall (Mo. App.), 187 S. W. 605, 607, cited by defendants and find that therein there was no evidence of qualification of the witnesses to express an opinion.

The judgment is affirmed. *Campbell, C.,* concurs.

PER CURIAM:—The foregoing opinion of Sperry, C., is adopted as the opinion of the court. The judgment is affirmed. All concur.

## On Motion for Rehearing.

SPERRY, C.—Defendants have filed motion for rehearing. Defendants set forth nine points in their motion, upon which they base their request for a rehearing of this cause. The matters presented by defendants in the first seven points of their motion have been passed on by this court on three different occasions. The opinion of this court with regard to such matters has been approved by the Supreme Court of Missouri in the case of State ex rel. Alton Railroad Company v. Shain et al., 143 S. W. (2d) 233, and in this, the third opinion of this court, the opinion of the Supreme Court and its directions therein contained are followed. The point raised by appellants at number 8 of their motion, with regard to the "tail" on plaintiff's Instruction 6, was considered by us in our main opinion. The Supreme Court in the case of Pence v. K. C. Laundry, 59 S. W. (2d) 663, l. c. 638, considered a "tail" of a humanitarian instruction very similar to the one here under discussion and approved the language of the instruction.

Because all of the matters urged by appellants at Points 1 to 8, inclusive, have heretofore been so thoroughly discussed and have been directly ruled on by this court in conformity with the controlling rulings of the Supreme Court, we decline to further discuss same herein, or to grant a rehearing thereon.

Under Point 9 defendants urge that this court improperly ruled that appellants "Point 7" of its "Points and Authorities" was not reviewable because "this point was not supported in defendants' brief by any cited authorities when the cause was submitted." In urging this point defendants apparently assume that in their original

"Points and Authorities," Point 7 was there supported by two authorities; and defendants attempt to construe the ruling of this court to mean that a point, in order to be reviewed, must be supported by authorities in the written "Argument." Such attempted construction is absurd and without any semblance of foundation as is shown by later statements by defendants in their motion. Defendants' Point 7 was not supported by authorities in their "Points and Authorities" within the meaning of Rule 15 of this court. Defendants, at page 12 of their motion, set forth the matters they allege appear in their brief under Point 7 of their original "Points and Authorities;" and it appears from their motion that two authorities were set forth under said Point 7. Such, however, are not the true facts.

The actual facts are that defendants' briefs, filed in this court when the cause was here on two prior hearings and when it was before the Supreme Court, *did not contain any reference to this point* at all. In its brief filed herein, on the third (present) hearing, this point appeared in their brief for the first time. However, no authority was cited, in support of this point, in the brief served upon the respondent, and none furnished to her until after the time for serving briefs by appellants had expired. Under the circumstances the point will not be considered. [Rule 15 of this court; Fuenfgeld v. Holt, 70 S. W. (2d) 143; Baker v. Mardis, 1 S. W. (2d) 223; Francis v. City of West Plains, 226 S. W. 369; Patton v. Buxton, 238 S. W. 118; West v. Duncan, 249 S. W. 127.]