Esther Melenson v. Charles M. Howell, Jr., Appellant.—130 S. W. (2d) 555.

Division One, July 7, 1939.

*Cooper, Neel & Sutherland* and *Frank J. Rogers* for appellant.

*Victor J. Schultz, Jasper DeMaria, Cowgill & Popham* and *Guy W. Green, Jr.,* for respondent.

HYDE, C.—This is an action for damages for personal injuries. Plaintiff had a verdict for $25,000. The trial court required a *remittitur* of $10,000, which was made, and final judgment was entered for $15,000. Defendant has appealed from this judgment.

Plaintiff makes the contention "that defendant is in the same position on this record as if none of the points raised were mentioned in a motion for new trial." The basis of this claim is that, although defendant filed a timely motion for new trial, this went to the first judgment entered for $25,000, and that, when, after *remittitur*, a new judgment was entered for $15,000, no motion was thereafter filed. Plaintiff says "the motion for new trial filed March 2, 1936, was directed to 'the verdict and judgment' then existing, and could not have been directed to the final judgment entered some four months afterwards." The same point is made as to motion in arrest of judgment. This is a misconception of the functions of such motion. A motion for new trial is a common law motion to prevent judgment, so it is directed only to the verdict and not to any judgment. [State ex rel. Conant v. Trimble, 311 Mo. 128, 277 S. W. 916, l. c. 920.] Its primary purpose is to prevent the entry of a final judgment, on the verdict, which it would accomplish if sustained. The usual practice in this State is to immediately enter a judgment on a verdict. However, such a judgment remains interlocutory and does not become final until after the time for filing motions to prevent entry of judgment has expired (Sec. 1005, R. S. 1929) without such motions being filed, or, if filed, until they are determined. [Cox v. Schaab Stove & Furniture Co., 332 Mo. 492, 58 S. W. (2d) 700; Stephens v. Oberman Mfg. Co., 334 Mo. 1078, 70 S. W. (2d) 899.] The secondary function of a motion for new trial is to preserve matters of exception for appellate review, which purpose is accomplished, as to all such matters mentioned therein, when the trial court overrules it, and enters final judgment, or makes the judgment final if already entered. [Castorina v. Herrmann, 340 Mo. 1026, 104 S. W. (2d) 297.] Only one motion for a new trial is necessary to accomplish either purpose. In fact, a second motion, filed more than four

days after verdict, amounts only to a suggestion and would not authorize any court to do anything that it could not do without it. [State ex rel. Conant v. Trimble, 311 Mo. 128, 277 S. W. 916; State ex rel. Union Electric Light & Power Co. v. Sevier, 339 Mo. 732, 98 S. W. (2d) 980; City of St. Louis v. Senter Comm. Co., 340 Mo. 633, 102 S. W. (2d) 103.] There was no final judgment in this case (from which an appeal could be taken) except the one entered after *remittitur*. This Court en Banc in St. Louis v. Senter Commission Co., supra, finally disposed of the idea that a motion in arrest could serve any function in the preservation of any matter for appellate review.

■ Plaintiff's case was submitted solely upon negligence under the humanitarian rule. Defendant contends that plaintiff did not make a jury case, and assigns as error the overruling of his demurrer to the evidence. Therefore, the facts hereinafter stated are those which the evidence tended to show when viewed most favorably to plaintiff.

Plaintiff was injured in an automobile collision at the junction of Valentine Road with Broadway, in Kansas City, on May 19, 1935, between 7:30 and 8:00 P. M. The headlights of plaintiff's car were on at the time. There had been a drizzling rain in the afternoon but the streets were not wet at that time. Valentine Road ran west from Broadway but did not continue east beyond Broadway. There was a filling station on the east side of Broadway, facing this junction, located where Valentine Road would have been built if it had been extended east beyond Broadway. There were two street car tracks in the center of Broadway. Plaintiff approached the junction driving south on the west (southbound) track (right wheels "a foot to the east" of the west rail) while defendant was driving north on the east (northbound) track ("astraddle of the east rail"). Broadway was seventy-two feet from curb to curb; Valentine Road was 36.4 feet. It was fourteen feet, eight and one-half inches from the west rail of the southbound track to the east rail of the northbound track. There were pedestrian lanes eleven feet wide, marked across Broadway (east and west), somewhat back from points where the sidewalks, both north and south on Valentine, reached the junction, so that these lanes were seventy-three feet apart. There were safety zones, for street car passengers, commencing just beyond these pedestrian lanes (both north and south of the intersection) and extending back fifty feet, each with a further triangular extension of twelve feet. There were traffic signal lights at this junction to control both the Broadway traffic and the traffic coming into it from Valentine Road. There was a moving picture theatre and drug store on the southwest corner of the junction. On the evening of the collision it was cloudy and sunset was at 7:27 P. M.

Plaintiff was driving alone in a Ford sedan. Plaintiff's evidence was that she approached the junction at about 20 miles per hour. As she got there the lights were red. She decided to get gasoline at

the filling station on the east side of Broadway. The north driveway into this station began just south of the north pedestrian lane of the junction and this driveway was twenty feet wide. Plaintiff said: "There was no traffic coming out of Valentine Road, and I just presumed that it would be the logical time to make a left-hand turn." She said that there were no pedestrians on the north pedestrian lane; that she "practically stopped" (slowed to about three miles per hour) and "made my signal" (arm signal for a left turn) "pulled into the center of the street" and "then started to complete my turn" at "not more than five miles an hour," in second gear; and that when she was making the turn defendant's car was "just entering the safety zone" south of the junction, estimated by her to be "from 125 to 150 feet south" of where she was when she began to make the turn. Plaintiff made a rather sharp turn "south and east" (she "started making a big turn" when in the pedestrian lane) and was struck by defendant's automobile, when the front part of her car had "almost cleared" the northbound track ("at least the back half of it would be on the tracks"), all of her car having cleared the rails of the west track. The left front part of defendant's car collided with the right front part of plaintiff's car. Plaintiff's evidence was that her car was headed more east than south at the time of collision.

Plaintiff's own testimony was corroborated by an employee of the filling station who said: "I noticed her when she pulled up to the pedestrian lane, she was going very slowly and she put out her left hand, out and down. . . . I was standing in the door facing the street waiting for the lady to come in to wait on her. . . . The color of the control lights for the north and southbound traffic was red. . . . He (defendant) was 100 feet or better from the car (when plaintiff began to turn). . . . He was going between twenty-five and thirty." She was also corroborated by the driver of another car (a deputy sheriff of Cass County), who was also driving south on the same side of Broadway as plaintiff, and who took her to the hospital after the collision. He said: "We stopped before we got to the pedestrian lane, and the lights were just changing. . . . Just changing to red. . . . She was running very slow . . . anywhere from three to five miles. . . I saw a car coming from the south going north. . . . I stopped for the red light when I drove up there. . . . He (defendant) was on the south side of Valentine, I would say about where the south safety zone is. . . . Say eighty-five to 100 feet, maybe a little more (from plaintiff). . . . The car coming north, the left-hand front corner hit the right front corner of the Ford." Defendant stated that, under the conditions existing at the time, he could have stopped his car in twenty feet at twenty miles per hour; in twenty-five feet at twenty-five miles per hour; and in thirty feet at thirty miles per hour. He also said that his speed was about twenty miles per hour; that plaintiff's speed

was "around thirty miles an hour;" that he proceeded through the junction because the. traffic lights were green; that there was a car ahead of him in the junction; that traffic was moving both ways through it; that plaintiff's car suddenly veered out of a line of southbound traffic toward him when only about fifteen feet north of him; and that he made an immediate effort to swerve to the east (right) but was unable (swerved "not to exceed a foot") to avoid a collision. Defendant's car lights were turned on at the time.

Defendant contends that "the testimony of plaintiff and her two eyewitnesses to the effect that her. automobile was headed southeast, more east than south, at the time of the impact, is in conflict with the physical facts." Defendant also says that the physical facts corroborate his version of the collision. These facts were that both automobiles were partly on the northbound car tracks after the collision; that (as shown by pictures) the damage to defendant's car was all on the left side; that its left wheel was sheared off; and that the damage to plaintiff's car was all in front instead of on the right side. However, the damage to plaintiff's car does appear to be more to the right front part than to the left front part. Defendant said that he did swerve his car to some extent to the right. We cannot hold, on this record, that the evidence of plaintiff and her witnesses was unbelievable. It requires a very clear case to hold that positive corroborated testimony is untrue because of impossibility. [Parrent v. M. & O. Railroad Co., 334 Mo. 1201, 70 S. W. (2d) 1068; Bloecher v. Duerbeck, 338 Mo. 535, 92 S. W. (2d) 681.] If defendant is charged with seeing what plaintiff's witnesses said they saw, at the time and distances they specified, then the facts related by plaintiff and her witnesses (considered with reasonable inferences a. jury could draw therefrom most favorable to plaintiff) tend to show the existence of the constitutive elements of the humanitarian doctrine as stated and adhered to by this Court en Banc. [Banks v. Morris & Co., 302 Mo. 254, 257 S. W. 482.] We think that there was substantial evidence for the jury to so find. As noted in another left turn case, there is a very evident difference between the conduct and appearance of a car and driver in slowing down and making a left turn, and that of one suddenly or abruptly veering out of a line of moving traffic. [Spoeneman v. Uhri, 332 Mo. 821, 60 S. W. (2d) 9.] It was for the jury to say which happened here. The duty of defendant under the humanitarian doctrine, under the circumstances shown by plaintiff's evidence, was to "act on reasonable appearances and at a time when action would be effective." [Allen v. Kessler (Mo.), 64 S. W. (2d) 630; Womack v. Mo. Pac. Ry. Co., 337 Mo. 1160, 88 S. W. (2d) 368.] We hold that plaintiff did make a jury case and that it was for the jury to determine whether or not defendant was free from negligence.

Defendant also assigns as error the giving of plaintiff's main instruction (No. 1) which was, as follows:

"The Court instructs the jury that if you find and believe from the evidence that plaintiff was driving southwardly on Broadway and that when she reached a point at about the pedestrian lane which runs east and west near the north edge of the intersection in question, she started turning the Ford car to her left and toward the east and if you find that *after she started turning east that she was in a position of imminent and inescapable peril from the approach of said LaSalle automobile* operated by defendant Howell, if you so find, and that he saw or by the exercise of the highest degree of care would have seen the position of plaintiff and have known all the above facts, if you so find them to be the facts, *in time thereafter,* by the use of the highest degree of care and the means at hand and with safety to his automobile and its occupants and others to have stopped the same or slackened the speed thereof and thereby have prevented said collision and plaintiff being injured, if so, and that he failed to use the highest degree of care so to do and was thereby negligent, if you so find, and that as a direct result thereof said collision between said cars occurred and plaintiff was thereby injured, if you so find, then your verdict on her claim for damages against defendant must be for plaintiff Esther Melenson and against defendant Howell [and this is the law and is true even though you should believe that the north and south lights were red and that she should not have turned at said time and place and that she was herself negligent in getting into and being in the aforesaid position of peril] and danger (if she was) on said occasion."

Defendant says that this instruction "erroneously informs the jury that the plaintiff entered a position of imminent and inescapable peril at the time she started turning her automobile to the east and to her left, and places a duty on the defendant to act, prior to the time plaintiff was in peril;" and that it "fails to limit defendant's duty to act, to a time after he saw plaintiff in a position of peril and gives the jury a roving commission to determine when this duty arose." We do not think that this instruction is susceptible of such construction. Defendant relies upon Smithers v. Barker, 341 Mo. 1017, 111 S. W. (2d) 47. The italicized portion of this instruction (which is criticized by defendant) does not authorize a finding of a position of imminent perile *while* plaintiff started turning east (as in the Smithers case), or *when* plaintiff started turning east, but only *after* plaintiff started turning east. This did not extend the zone of peril but, on the contrary, expressly limited it by requiring a finding of a position of imminent peril beginning *after* plaintiff started to turn. In effect, it told the jury that plaintiff was not in such position before or even when she started to turn. This instruction did not (as in the Smithers case) refer to the ability of defendant to see plaintiff entering into and upon an intersection (when stops were made by that plaintiff both upon and after entering) so as to convey

the ·idea that defendant's duty under the humanitarian rule commenced before plaintiff actually did finally start (after two stops) to cross defendant's path. Instead, it clearly meant that defendant's duty began when ''he saw or by the exercise of ordinary care would have seen the position of plaintiff and have known all the above facts'' (previously hypothesized), if he did see and know them (or should have) ''*in time thereafter*'' to have prevented a collision by stopping or slackening speed. Defendant also says that the above reference to ''the position of plaintiff'' would not mean ''position of imminent and inescapable peril'' to the jury, but, since it is combined with ''and known all of the above facts'' (hypothesized), we do not see how they could fail to so understand it.

Furthermore, in the Smithers case, plaintiff had to cross half of the street (about 18½ feet) and both street car tracks (about 14½ feet) and the width of the safety zone on the other side (5½ feet) in order to get into the path of defendant's car. Here plaintiff was on one street car track and defendant on the other. It is obvious that plaintiff did come into a position of imminent peril very soon after she started turning east. Her car was in the path of defendant's car when she moved only half its length to the east. Moreover, this instruction went further than requiring a finding of imminent peril and required a finding of imminent and inescapable peril, which connotes a narrower danger zone. [Perkins v. Term. Railroad Assn., 340 Mo. 868, 102 S. W. (2d) 915.] This was a real last clear chance submission, because inescapable peril means peril which the plaintiff was helpless to avoid by her own efforts but which requires some action on the part of defendant to avert it. [See American Law Ins. Restatement of Torts, sec. 479.] ''Inescapable'' is not a technical word and a jury would surely understand its meaning as applied to this situation. In this kind of a situation, obliviousness is immaterial and, if an automobile driver, has the time and the means to avoid injuring a person in such peril, after he knows or should know of it, it is his duty to do so. [See Banks v. Morris & Co., supra, which was that kind of a case.] It is obliviousness that widens the zone of imminent peril. [Smithers v. Barker, supra; Lotta v. Kansas City Pub. Serv. Co., 342 Mo. 743, 117 S. W. (2d) 296.] Here obliviousness was not relied upon and failure to warn was not submitted. [See Pentecost v. St. L. M. B. T. Railroad Co., 334 Mo. 572, 66 S. W. (2d) 533.] Certainly, if plaintiff's evidence is believed, there was a time after plaintiff started turning east when (moving slowly as she was) she would have been unable by her own efforts to escape from the path of defendant's car (moving five times as fast) if it continued to move in the same direction and at the same speed. It was for the jury to decide whether this evidence was true and, if so, to say whether or not defendant knew or should have known of plaintiff's position of imminent and inescapable peril soon enough after it occurred to have

had time, with the means available to him, to prevent her injury by stopping his car or slackening its speed, and this is the meaning of this instruction.

■ Defendant further contends that plaintiff's Instruction No. 1 conflicts with defendant's Instruction G and authorizes a verdict even though plaintiff's negligence was found to be the sole cause of her injury. This criticism is made against the so-called "tail" of the instruction (in brackets above) and is also made in reliance upon Smithers v. Barker, supra. Instruction G hypothesized (as was also done by defendant's Instruction F) the facts of defendant's version (sudden swerving of plaintiff's car into his car) which if believed would authorize a finding that plaintiff's negligence was the sole cause of her injury. However, the situation here was very different from that in the Smithers case because there defendant was on an arterial street where he was entitled to and could reasonably expect to have the right of way across the intersection. There defendant's sole cause theory was that plaintiff ran a stop sign and came at high speed across his path. The "tail" on that plaintiff's instruction was that plaintiff could recover even if he was "drunk and negligent in getting himself into . . . imminent peril." We said that we could not approve that language under the circumstances of that case. We, however, also said: "We consider it to be proper in a humanitarian negligence case to inform the jury that contributory negligence of plaintiff is not a defense or that negligence of plaintiff which only contributed to or concurred in his injury does not defeat his recovery." [See, also, State ex rel. Kansas City Pub. Serv. Co. v. Shain, 343 Mo. 1066, 124 S. W. (2d) 1097; Crews v. Kansas City Pub. Serv. Co., 341 Mo. 1090, 111 S. W. (2d) 54.] Here defendant was not entitled to be in the intersection if the lights were red. A sole cause instruction could only be justified on the theory that the lights were green for north and south traffic (otherwise defendant's negligence in running a red light would be a concurring cause) and that was defendant's theory. Defendant not only had a sole cause instruction but also set up a counterclaim, and instructed on it that he was entitled to recover damages from plaintiff if they believed his version. The facts hypothesized in this instruction, authorizing a verdict against plaintiff for defendant's damages, also necessarily required the jury to believe that the lights were green before they could find in his favor. Plaintiff had a contributory instruction (in defense to the counterclaim) which told the jury that defendant could not recover thereon if they believed "that as defendant Howell approached and entered the intersection in question at said time and place the traffic control lights affecting north and south bound traffic were red and that defendant Howell entered said intersection contrary to and against same." In other words, if the lights were red at the time, plaintiff's conduct in turning into the filling station (as hypothesized

in plaintiff's main instruction) could only have been contributory negligence, and not the sole cause of the collision, because defendant would have been also negligent in being in the intersection contrary to the red light. Our view is that, under these circumstances, this "tail" did not make plaintiff's instruction prejudicially erroneous.

Defendant's final complaint against plaintiff's Instruction No. 1 is that it "erroneously refers to and permits the jury to consider defendant's alleged primary negligence in running a red traffic light, in determining his negligence under the humanitarian rule." We think it is clear that it does not do so because it refers only to plaintiff's conduct in turning east (to go into the filling station) and not to defendant's conduct. As we have shown, the color of the light at the time was one of the principal and most hotly contested fact issues in this case. Plaintiff did have an instruction on defendant's negligence in running a red light as contributory negligence, which was proper as a defense to defendant's counterclaim. Because of the issue of the red lights on defendant's primary negligence case against plaintiff, we think it was proper to tell the jury what its effect was upon plaintiff's humanitarian negligence case against defendant. While no doubt the wording of plaintiff's instruction could be improved to specifically state that it only referred to contributory negligence of plaintiff, we hold that the whole submission made the issues sufficiently clear so as to be free from prejudicial error.

It is also contended that the verdict was the result of passion and prejudice and is still excessive after *remittitur*. Plaintiff sustained a knee and ankle injury but her principal injury was to her nose and face. Plaintiff's nose and cheek bones were fractured in several places. Her face remained badly disfigured, after five severe and painful plastic surgery operations, and will be so permanently. The X-ray examination showed the following bone injuries:

"There are five, at least, distinct fractures, with considerable shattering of those various five fractures. In other words, it is pretty much of a pulverized bone. . . . A general disruption of the structures around the nose, with a fracture on the left side . . . on the inner side of the eye with this bone on the bridge of the nose displaced inward. In addition to that, there is a fracture,—rather, a shattering of the bone of the upper portion of this cheek bone, . . . which we call the antrum. On the right side there was a fracture line extending downward across the floor of the eye socket and into this sinus, but she did not have the displacement that the one on the left did. The septum or partition which runs normally straight up and down the mid-line in the nose is pretty nearly completely displaced. . . . In the foot, the heel bone of the foot, there are two very minute bone fragments which have been pulled off of the heel bone—the front part of the heel bone. . . . The ligament is torn loose and detaches a very small fragment of bone."

Plaintiff was twenty-five years old and was earning $13.50 per week at Harzfeld's store in Kansas City, doing stenographic, clerical and statistical work. She had taken business administration work at the University of Kansas and "was studying to become a buyer." She said her upper lip and gums were numb and one of her physicians testified that this was due to permanent nerve injury. Her sense of smell was gone. There was also leaking of the sinus ducts and "quite a bit of pain" was still caused by the condition of her nose and face. She also testified: "My knee just wobbles; it just goes out from under me, just as if it were made of jelly or something rather than bone. . . . My heel doesn't come down flat on the floor like my right heel does, and naturally that would make one leg shorter, or one foot shorter than the other, and there is a slight limp." She wore an elastic support for her knee and there was medical evidence that her "left knee was slightly unstable," and that "there is some contraction of the heel tendon." Her eyes were also affected so that she was unable to do much reading. There was medical testimony that "the left pupil was larger than the right;" and that there was permanent vision impairment. There was also medical evidence of permanent impairment of her nervous system.

We find nothing in the record that we can hold shows passion or prejudice on the part of the jury. The case was hotly contested, on directly conflicting versions of the facts, but we do not think improperly so. The able and experienced judge, who presided at the trial exercised his discretion to compel reduction of the verdict in a very substantial amount. We cannot hold, in view of the serious permanently disabling injuries and permanent facial disfigurement of this young woman, that the amount remaining ($15,000) is excessive. [See O'Brien v. Rindskopf, 334 Mo. 1233, 70 S. W. (2d) 1085; Grab v. Davis Const. Co. (Mo. App.), 109 S. W. (2d) 882; Arnold v. May Dept. Stores, 337 Mo. 727, 85 S. W. (2d) 748; Clark v. Atchison & Eastern Bridge Co., 333 Mo. 721, 62 S. W. (2d) 1079.]

The judgment is affirmed. *Bradley, C.,* concurs; *Dalton, C.,* not sitting.

PER CURIAM:—The foregoing opinion by Hyde, C., is adopted as the opinion of the court. All the judges concur.