Glenn Evans, by next friend, Olive Evans, v. Farmers Elevator Company, Appellant.—147 S. W. (2d) 593.

Division One, February 14, 1941.

*Embry & Embry* for appellant.

*W. W. McCanles, O. D. Robertson* and *Hogsett, Murray, Trippe, Depping & Houts* for respondent.

330

DALTON, C.—This is an action for personal injuries. Plaintiff, a thirteen year old boy, was riding as a guest in the front seat of a Chevrolet coach driven by his grandmother, and was injured when the automobile collided with a heavily loaded Ford V-8 truck. Plaintiff pleaded primary negligence and negligence under the humanitarian doctrine, but went to the jury on humanitarian negligence only. The jury returned a verdict for plaintiff for $10,000. After motion for a new trial was filed and overruled, defendant appealed.

The original petition charged the defendant with primary negligence: (1) in driving on the left hand side of the highway; (2) in operating the truck at a dangerous rate of speed; and (3) in failing to keep a reasonable lookout for vehicles on the highway. At the close of plaintiff's evidence the court indicated that he would direct a verdict for defendant, and plaintiff, thereupon, by leave of court, amended his petition, and charged negligence under the humanitarian doctrine in failing to stop, turn aside or slacken the speed of the truck, and avoid injuring plaintiff, after plaintiff was in imminent peril. Failure to slacken speed was not included on final submission. Defendant's answer was a general denial.

Error is assigned upon the court's action in refusing to give a peremptory instruction, directing a verdict for the defendant, as requested at the close of all of the evidence. Error is also assigned upon the refusal of a similar instruction at the close of plaintiff's evidence, but any right to complain of such ruling was waived when defendant refused to stand upon its request and offered evidence after the instruction was refused. [Kelso v. W. A. Ross Construction Company, 337 Mo. 202, 85 S. W. (2d) 527; Gettys v. American Car & Foundry Company, 322 Mo. 787, 16 S. W. (2d) 85.] It is further

contended that certain instructions are erroneous and the verdict is excessive.

In determining the first assignment a careful review of all the evidence, in a light most favorable to plaintiff, is required. The collision occurred about 10:30 A. M. August 10, 1936, on Highway 50, west of Lone Jack, where the highway is straight and level for ¼ mile between two slopes or hills. The highway extends east and west and is paved. The pavement is 20 feet in width with a black line in the center. Plaintiff and his grandmother were going west toward his home in Raytown. Defendant's truck, loaded with 5 tons of sacked feed, was traveling east. For convenience we shall refer to one motor vehicle as the *car* and to the other as the *truck*.

The testimony of plaintiff's grandmother tended to show that she was 53 years of age; that she had driven different makes of cars, had been driving for fifteen years and was familiar with the highway; that the car was new and in good condition and had been in use only about thirty days; that she was driving 35 or 40 miles per hour on the north (her right) side of the road; that, as she came down to the foot of the hill at the east end of the level stretch of road, she saw the truck, near the foot of the incline at the west, coming toward her at about the same rate of speed; that she noticed the truck was swaying and weaving and coming over on her side of the black line; that the truck continued to come over the black line, until it was entirely on her side of the road, but that it didn't stay long; that she applied the foot brake lightly and "tooted the horn;" that it looked like the driver's head was down and, when she "tooted the horn, he kind-of raised up" and seemed to start to cut back as she started to turn; that she had to choose between going ahead, trying to pass on the south or taking the shoulder on the north; that there was a concrete spillway over the shoulder on the north, so she tried to pass on the south; that the vehicles were about 250 feet apart when both started to turn; that she drove over to the south side of the highway as the truck cut back to the south side and ran its right wheels off on the south shoulder; that, when both vehicles reached the south side of the highway, they were about 75 feet apart (she later refused to estimate this distance and said she could not state the position after they turned); that when the truck was partly on the south shoulder, and the two vehicles were about 75 feet apart, she was going back to her side of the road with the car at an angle; that the collision occurred before all of her car got back across the black line to the north side of the road; that the front of the truck hit the car back of the driver's seat; and that the car stopped on its left side, headed north, in the center of the highway with its wheels to the east, but with most of the car on the north side of the highway.

Plaintiff's testimony tended to corroborate that of his grandmother. He said he saw the truck as they started down the east hill; that the

truck was then in the flat; that it came swerving backward and forward over to the north side of the highway; that, when both the car and the truck were on the north side of the highway, facing each other, both were turned and went over to the south side of the highway; that, when both were on the south side of the highway, both were turned to go toward the north side; that the collision happened near the center of the highway; and that, although the right wheels of the truck were on the south shoulder, the car had not gotten back to the north side of the road. He said the truck hit the car back of the driver's seat and swung it around so it hit the back end of the truck. He did not undertake to estimate speeds or distances.

Other evidence offered by plaintiff tended to show that after the collision the truck was turned over on its right side on the south shoulder of the highway headed east with the front wheels near the edge of the slab; that on the truck a front tie rod was bent, the fender back of the left rear wheel mashed, and the left running board mashed against the door of the cab; that the radiator grill work and front bumper of the truck were not damaged; that a place was scooped out on the right shoulder of the highway about 2 feet from the slab where the weighted right rear wheel of the truck had turned over; that there were dual tire tracks on the shoulder for 10 to 20 feet in a straight line back of the place where the truck had turned over; that about one-half of the truck was off of the highway on the south shoulder at the time the tracks were made; and that the truck and car were 15 to 20 feet apart after the collision. Plaintiff received permanent and severe injuries.

The testimony of defendant's truck driver, defendant's witness, tended to show that he was going east at about 30 miles per hour on the south side of the highway and that he remained on the south side of the highway; that he wasn't asleep, didn't have his head down, and was looking up the road at all times; that when he "had just leveled off into the flat (or was leveling off) he saw the car" as it came over the hill from the east; that it meet and passed a large transport truck as it came down the hill; that the transport truck was about 500 or 600 feet ahead of defendant's truck; that when the car passed the transport truck he noticed the car start to weave toward the truck and sway as if the driver had lost control; that the car continued to weave from one side of the pavement to the other down the hill until it was 60 to 75 feet away, when the car seemed to straighten up on the north side of the road for a short distance, then it turned abruptly to the left. He said: "It just came right in and hit the left hand front corner of my bed and swung around and hit the front wheel, jerked the steering wheel out of my hand and that put the truck in a careening position, and in that position I turned over;" that he was then partly off of the pavement and had slowed to 10 or 15 miles per hour; that the car was traveling 50 miles per hour or more and did not change speed;

that the impact started about half way back on the hood of the car and the whole left hand side of the car was torn loose; that the radiator grill work on the car was not damaged, but the bumper was bent back about 8 inches (from the anchor) on the left side; that he had driven along the south shoulder for from 60 to 100 feet; that when he saw the car start to weave he put on his brakes and started slowing down; and that when the car came closer he thought he was in danger. He said: "I thought I might give her a chance to get by and I slowed down then 10 or 15 miles an hour or possibly that and pulled onto the shoulder . . . as far as I knew it was safe" without a risk of turning over. He said he didn't stop because he didn't think it was any safer one place than another; that the brakes on the truck were in good condition but he didn't know how quickly he could have stopped; that after the collision the front end of the truck or bumper was right on the black line with the rear off the pavement; and that there was a dent in the front bumper of the truck.

The testimony of other witnesses offered by defendant tended to show that the truck was hit right behind the left front wheel on the left side and on the left front corner of the grain bed; that the left rear fender had been bent in behind the rear wheel; that the truck was not otherwise damaged; that the car was practically demolished, that is, one whole side of it; that "the speedometer was sitting on 50 miles an hour and the glass was broken;" that the tracks on the shoulder showed the truck left the slab 50 to 60 (and 60 to 80) feet back of where it turned over; that the track of the right wheels was 2 feet off the concrete; that the concrete spillway across each shoulder of the road was 100 to 150 feet east of the place of the collision; that there was a culvert 7 to 8 feet east of the spillway; that after the collision the car was across the road with the largest part *south* of the black line; that there were marks on the south part of the concrete pavement where some heavy object had dragged over it for 10 to 15 feet west of where the truck was lying; that the truck was 5 feet east of the place where the wheel had dug down on the shoulder 2 feet south of the slab.

In rebuttal plaintiff offered evidence to show that the collision occured 918 feet east of the foot of the west hill and 767 feet west of the top of the east hill; and by cross-examination showed that such a truck with such a load (5 tons of feed) at 30 to 35 miles an hour could have been stopped in 100 feet; that at 15 to 20 miles an hour it could have stopped in 60 to 70 feet; and that the south shoulder of the highway was 7 to 8 feet wide with grass on it.

Appellant contends that "the evidence failed to show that plaintiff was in a position of humanitarian peril, or, if he was, when and where such peril began;" and failed to show "that defendant's driver could have acted in prevention of the collision with the means at hand" after the duty arose, if it did. Appellant says "the plaintiff's case was

void of any evidence that the truck driver could have done anything that he did not do with any reasonable certainty whatsoever of avoiding the collision.''

We think it is evident that plaintiff was in imminent peril, at least from the moment both cars started to turn to the south. We think the peril was certain and imminent within the authorities relied upon by appellant. [Banks v. Morris & Co., 302 Mo. 254, 267, 257 S. W. 482, 484; Kirkham v. Jenkins Music Co., 340 Mo. 911, 916, 104 S. W. (2d) 234, 236; Perkins v. Terminal Railway Association, 340 Mo. 868, 102 S. W. (2d) 915, 921; Swain v. Anders (Mo. App.), 140 S. W. (2d) 730, 736.] If, under the evidence, such peril was or should have been apparent to defendant's driver, in the exercise of ordinary care (only ordinary care is charged), and if defendant's truck driver, in the exercise of such care with the means at hand, with safety to himself and the truck, could have stopped his truck or turned the same aside and avoided the collision, it was his duty to do so. The evidence tended to show that the loaded truck traveling 30 to 35 miles an hour could have been stopped in 100 feet or at 15 to 30 miles per hour in 60 to 70 feet; that the vehicles, traveling 35 to 40 miles an hour, began to turn to the south side of the highway when they were approximately 250 feet (approximately 2½ seconds) apart; that defendant's truck reached and was upon the south shoulder of the highway while the vehicles were still approximately 75 feet apart and while the car was going back north; that the south shoulder was 7 to 8 feet wide, level, and covered with grass; and that the car, going back north at an angle, was hit back of the driver's seat, indicating that if the truck had stopped or had been turned further to the south the collision would have been avoided. Defendant's evidence indicated that the speed of the truck did not exceed 30 miles per hour and was slowed to 10 or 15 miles per hour prior to the collision; that the truck traveled 50 to 100 feet in a straight line on the south shoulder, never over 2 feet off the concrete; and that it was not stopped prior to the collision. These facts are not inconsistent with plaintiff's testimony or his theory of the case. Plaintiff made no estimates of speed or distances, and the estimates of his witnesses are not conclusive, but must be considered with the other evidence in the case and viewed in a light most favorable to plaintiff. Plaintiff is entitled to the benefit of all of the favorable evidence and all reasonable inferences therefrom not inconsistent with his own testimony and his theory of the case.

We think the evidence sufficient to make an issue of fact as to whether or not, after the peril arose, the collision might have been avoided by defendant's driver. We hold, therefore, that the evidence was sufficient to make a submissible case for plaintiff under the humanitarian doctrine on the theory that after the truck turned

to its right and the car turned to its left and plaintiff was in a position of imminent peril, that the truck driver, by the exercise of ordinary care, could have discovered the peril and could have stopped his truck or turned it aside and have avoided the collision. [Dillallo v. Lynch, 340 Mo. 82, 101 S. W. (2d) 7, 10; Branson v. Abernathy Furniture Company, 344 Mo. 1171, 130 S. W. (2d) 562, 565; Melenson v. Howell, 344 Mo. 1137, 130 S. W. (2d) 555, 557; Smithers v. Barker, 341 Mo. 1017, 111 S. W. (2d) 47, 50.] It is unnecessary to determine whether plaintiff made a case for the jury under any of his assignments of primary negligence. The assignment of error is overruled.

Appellant assigns error upon the giving of plaintiff's present instruction I, which, among other things, states: ". . . and if you further find . . . from the evidence that . . . defendant's driver . . . saw or by the exercise of ordinary care . . . could or should have seen *the automobile in which plaintiff was riding approaching and in a position of imminent danger and peril of being struck and the plaintiff while riding therein was in a position of imminent danger and peril of being struck* and injured by said truck, if he was, and that thereafter the defendant's driver . . . could have stopped the truck or could have turned the same aside and thus avoided the collision . . . and thereby have avoided injuring the plaintiff, if you so find . . ." (Italics ours.)

Appellant contends (1) that there was no evidence upon which to base this instruction; that there was no proof of plaintiff's peril, or that defendant had notice, actual or constructive of such peril; and that there is no proof that defendant's driver had the ability to avert the impending injury; (2) that "the use of the word 'approaching' in said instruction is erroneous as indefinitely extending the danger zone and the field within which humanitarian vigilance is enacted;" (3) that the instruction by the use of the word "approaching" invited a consideration by the jury of antecedent negligence of defendant's driver in driving on the wrong side of the road or being asleep and not keeping a lookout.

Respondent says, that "the case is not governed by the humanitarian doctrine; . . . that plaintiff is entitled to rely upon primary negligence . . .; that the element of contributory negligence necessary to relegate plaintiff to the humanitarian doctrine, is wholly absent on the pleadings," evidence and instructions; and that "plaintiff . . . was entitled to go to the jury and recover as for primary negligence on the part of defendant's driver in failing to avert the collision" by failing to stop or turn the truck aside. Respondent contends that the cause was submitted upon the negligence pleaded and exactly as pleaded; that, if he pleaded humanitarian negligence, by the amendment; that is what he submitted; and that, if he submitted primary negligence in the instruction, that is what he pleaded by the amendment.

We think it is apparent that plaintiff attempted to plead and submit humanitarian negligence, otherwise, he would not have referred to "imminent peril" or have required a finding "that *thereafter* the defendant's driver . . . could have . . . avoided the collision." Such terms would have had no place unless plaintiff was pleading or submitting humanitarian negligence, and there was no duty to act under the humanitarian rule until a position of imminent peril came into existence. [Roach v. K. C. Public Service Co. (Mo.), 141 S. W. (2d) 800, 802.] The allegations of primary negligence were abandoned and no instructions were requested thereon. [Yuronis v. Wells, 322 Mo. 1039, 17 S. W. (2d) 518, 521.]

Respondent further contends that the instruction is good within the rule laid down in Kick v. Franklin, 345 Mo. 752, 137 S. W. (2d) 512, 515, even if the humanitarian doctrine applies.

In the case of Kick v. Franklin, supra, an instruction required a finding that "said automobile and plaintiff were moving toward said tracks and immediately coming into and were in a position of imminent peril and danger of being struck and injured by said train" and, later in the instruction, required a finding "that after plaintiff was in imminent peril, if so, as aforesaid, said engineer gave no timely warning . . ." This court said: "The instruction in the case at bar does not offend the rule in this respect (by extending the scope of the duty to act so as to include the time when a plaintiff was approaching or immediately coming into a position of imminent peril). It will be noticed that the words *immediately coming into* a position of peril were used only in the first part of the instruction. The instruction, however, did not impose any duty on the appellant until after the plaintiff was in imminent peril."

In the case of Hilton v. Terminal Railroad Assn., of St. Louis, 345 Mo. 987, 137 S. W. (2d) 520, 522, the instruction required a finding "that the defendant . . . saw or . . . could or would have seen the plaintiff approaching and in such position of imminent peril, and oblivious . . . in time, thereafter . . . (to) have stopped said motor car, . . ." The court held that to say a plaintiff is approaching a position of imminent peril expressly denies that he is in present, existing imminent peril, and the giving of the instruction was held to be reversible error. [See also State ex rel. Snider v. Shain, 345 Mo. 950, 137 S. W. (2d) 527; Buehler v. Festus Merc. Co., 343 Mo. 139, 158, 119 S. W. (2d) 961, 970; Roach v. Kansas City Public Service Co., supra.]

The instruction before us, set out supra, requires the jury to find from the evidence that the truck driver saw or "should have seen the *automobile* . . . approaching and in a position of imminent danger . . . and the *plaintiff* . . . was in a position of imminent danger and peril of being struck and injured by said truck, if he was, and that *thereafter*, etc., . . ." But the plaintiff was in no

peril unless the automobile was in peril, and it will be noticed that the provision referring to the *plaintiff* immediately follows the provision with reference to the *automobile*. The requirement, that the jury find the automobile was only *approaching* and in a position of imminent danger and peril, is clearly erroneous within the rule stated in the Hilton and other cases cited supra. The provision with reference to *plaintiff* is directly connected up with this provision about the *automobile*. The particular words of the instruction are as follows: ". . . the automobile *in which plaintiff was riding* . . ." and ". . . the plaintiff *while riding therein* . . ." A jury would not separate the plaintiff's position from that of the automobile. We are of the opinion that the instruction was erroneous as extending the danger zone to include plaintiff while *approaching* a position of imminent peril. The instruction did not clearly require the jury to find that plaintiff was in fact in a position of imminent peril and danger of being struck before it required the jury to determine whether, thereafter, defendant's driver could have avoided the collision by the exercise of ordinary care in stopping the truck or in turning the same aside. [Hilton v. Terminal Railroad Assn., of St. Louis, supra; Buehler v. Festus Merc. Co., supra; State ex rel. Snider v. Shain, supra.]

Appellant assigns error upon the giving of plaintiff's instruction II on the measure of damages. This instruction, among other things, told the jury that in estimating plaintiff's damages ". . . you may further take into consideration *any impairment to his earning power and capacity*, if any, *which may result directly from the injuries* which he has sustained, if any." (Italics ours.) Appellant contends that the instruction is erroneous because "plaintiff was not entitled to recover any damages for any impairment of earning capacity during his minority;" and that "this instruction, permitting recovery for any impairment of earning capacity, without excluding the period of plaintiff's minority, was positive misdirection," and, therefore, reversible error.

Respondent concedes there is no evidence that plaintiff was emancipated, and that appellant's position is supported by the decisions in the case of White v. Ennis Coffee Co. (Mo. App.), 182 S. W. 775, 776, and by Ellington v. Chi., R. I. & P. Ry. Co. (Mo. App.), 45 S. W. (2d) 105, 107, both decided by the Kansas City Court of Appeals. Respondent contends that said cases are contrary to subsequent decisions of this court. In the White case, supra (182 S. W. 775, 776) the court said: "Plaintiff's instruction No. 4 is on the measure of damages and is a misdirection. Among a number of proper items of damage it affirmatively directed the jury that, if the verdict was for him, damages should be allowed *for the effect of his injury upon his earning capacity or ability to earn a livelihood in the future*. The loss of earning capacity in a minor during his minority is a loss

to the parent, and should not be included as damages to the minor. . . . The decisions in this State announcing the same rule are numerous." (Italics ours.)

In the Ellington case, supra (45 S. W. (2d) 105, 107), the court said: "This instruction, among other things, submits that the jury might take into consideration any *loss of earning capacity* which plaintiff may have suffered. Plaintiff was a minor and there is no evidence of emancipation. The instruction is undoubtedly erroneous." (Italics ours.)

In the case of Chapman v. Mo. Pac. Railroad Co., 217 Mo. App. 312, 269 S. W. 688, 690 (10), decided by the Springfield Court of Appeals, an instruction on the elements of damage to an infant stated: "The extent, if any, to which he has been prevented and disabled by reason of such injuries from working and earning a livelihood for himself." The court said: "There is no evidence that plaintiff had been emancipated, and in such case he would not in law be entitled to his earnings prior to attaining his majority. If plaintiff's injuries are of such character as to impair his earning power after reaching his majority or if he has been emancipated, then such would be a proper element of damage otherwise it would not be."

The general rule is well stated in 46 C. J. 1301, sec. 114 as follows: "An injury to a minor child gives rise to two causes of action, one on behalf of the child for pain and suffering, his permanent injury, and impairment of earning capacity after attaining majority, the other on behalf of the parent for loss of services during minority, and expenses of treatment, and the damages peculiar to one of these causes of action cannot properly be recovered in an action based on the other in the absence of any waiver or estoppel."

In 31 C. J. 1115, sec. 252, it is said: "Ordinarily an infant suing for personal injuries cannot recover for the impairment of his earning capacity during infancy." This rule is recognized (not decided) in Wise v. St. Louis Transit Co., 198 Mo. 546, 560-562, 95 S. W. 898, and is mentioned in Scanlon v. Kansas City, 325 Mo. 125, 137, 28 S. W. (2d) 84, 88.

In the case of Steinkamp v. F. B. Chamberlain Co. (Mo. App.), 294 S. W. 762, 764, decided by the St. Louis Court of Appeals, plaintiff, an infant, sought to recover damages for personal injuries. Defendant assigned error on an instruction on a measure of damages. The court said: "Only one instruction was given on behalf of plaintiff. It related exclusively to the measure of damages. It is complained of by the defendant because it allows the jury to compensate plaintiff for *diminution of earning capacity*, whereas since there was no showing that plaintiff had been emancipated, his *earnings* during his minority belonged to his parents. It will be observed that the instruction does not allow the jury to compensate plaintiff for *loss of earnings*, but allows them to compensate him merely for *diminution of his*

*capacity to earn money,* or, in other words, for diminution of his capacity to perform labor of which earnings become the fruits. The courts make a distinction between the *diminution of the capacity to labor* and *the loss of earnings,* and they hold that a recovery may be had for the diminution of the capacity to labor, though there may, in fact, be no actual loss of earnings.'' (Italics ours.)

In the case of Wagner v. Gilsonite Const. Co. (Mo.), 220 S. W. 890, 898, an instruction on the measure of damages permitting a minor plaintiff to recover for ''impairment of earning capacity'' was approved, but apparently the objection here was not raised.

Respondent contends that appellant ''overlooks the distinction between *earning capacity* and the *earnings themselves,* and the rule that an unemancipated minor may recover for *impairment of earning capacity during minority* as well as thereafter,. although only the parents can recover for the *loss of earnings* themselves during the child's minority.''

Respondent further contends that ''the status of an unemancipated minor is similar to that of a married woman as regards the distinction between impairment of earning capacity and loss of earnings;'' that the decisions of this court distinguish between the *earning capacity* of a married woman and the *earnings themselves* and hold that a married woman may recover for the impairment of her earning capacity although the cause of action for the loss of the earnings themselves is in her husband; and that in such cases, decided by this court, the case of Steinkamp v. Chamberlain, supra, has been cited with approval.

Respondent relies particularly on the case of Wolfe v. Kansas City, 334 Mo. 796, 68 S. W. (2d) 821, and the cases cited therein. In the Wolfe case, plaintiff a married woman, sued for damages for personal injuries. An instruction on the measure of damages told the jury that it might consider ''the impairment, if any, of her power to earn money.'' Appellant claimed the instruction erroneous for the reason that there was *no evidence* of plaintiff's power to earn money. This court construed the instruction as referring to *present loss of power to work and earn money* as distinguished from *loss of future earnings* and held the instruction proper, since the inability to earn money was included in the inability to work and since damages were recoverable for impairment of capacity to labor without proof of actual loss of earnings. The court said (334 Mo. 796, 68 S. W. (2d) 821, 823): ''There is a distinction between the power or capacity to work and earn money and loss of time, or money that one probably will lose in the future on account of physical or mental disability. Loss of time, or what one may reasonably be expected to earn in the future, comes under the head of the amount of loss of time or earnings, or the fruits or gains from the power or capacity to work and earn money. . . . So the inability to work or labor, physical or mental, is something

more than discomfort, inconvenience and annoyance. It is that plus the inability to, wholly or partially earn a living, either by working for others at a wage or salary (money) or for one's self. Viewing it from this standpoint, the inability to earn money is included in the (in) ability to work. . . ." The court further said: "If defendant in the instant case feared that the jury might construe the instruction in question as allowing compensation for probable future loss of time and earnings, it should have requested an instruction clarifying the matter. It requested no such instruction and is therefore in no position to complain."

The court distinguished the case of Davidson v. Transit Co., 211 Mo. 320, 345, 109 S. W. 583, 589, a married woman's case, involving an instruction containing the words "her probable impairment of earning capacity in the future" by saying (334 Mo. 796, 68 S. W. (2d) 821, 824): "An analysis of what the court said in that opinion clearly shows that the court gave to the words used in the instruction, under the peculiar circumstances of that case, the meaning of probable loss of time or earnings in the future, rather than the present power and ability to work for a living or earn money."

The court in the Wolfe case, supra, cited the case of Steinkamp v. Chamberlain Co., supra, with approval.

In the case of Kleinlein v. Foskin, 321 Mo. 887, 13 S. W. (2d) 648, 657, this court said: "Our courts, in several cases, have made a clear distinction between the diminution or *impairment of the capacity to labor* and the *loss of earnings,* and have held a recovery may be had for the diminution or impairment of the capacity to labor, although there may, in fact, be no actual loss of earnings," citing the case of Steinkamp v. Chamberlain Co., supra, and also the case of Perrigo v. St. Louis, 185 Mo. 274, 290, 84 S. W. 30. In the Perrigo case, which was a married woman's suit for damages, this court said: "Human nature is so constituted that physical labor in some form is essential to health and happiness and to be deprived of the *power to work* is one of the most serious personal injuries, *independent of the pecuniary benefits that such labor may confer,* . . . a married woman like any other human being ought to be compensated so far as may be for such deprivation, if wrongful. . . ."

It is upon the basis of the case of Steinkamp v. Chamberlain Co., supra, and the several cases from this court with reference to married women, mentioned above, that respondent insists the instruction here is not erroneous; that, if appellant thought said instruction might be misconstrued, it should have asked an instruction clarifying the matter; and that, since it has failed to do so, it may not complain.

The cases cited by respondent are inapplicable here in view of the particular wording of the instruction complained of and the objection raised by appellant. This objection was not raised ·in any of the cases relied on by respondent. We think the instruction is erroneous

and a positive misdirection. It did not purport to authorize a consideration of the present impairment of plaintiff's capacity to work or labor but authorized a consideration of "impairment to his earning power and capacity, if any, *which may result* directly from the injuries," that is, impairment of earning capacity in the future. The instruction looks to the future and not to a present loss or damage to plaintiff's power to labor. It directs the jury's attention to the impairment of earning power and capacity in the future which would be understood to include loss of pecuniary benefit resulting from said injuries. It would, we believe, be understood as including probable loss of wages and earnings. The loss of earning capacity in a minor during minority is a loss to his parents who are entitled to both his services and his earnings. Whether or not the instruction is even technically correct depends upon how it would be construed. Even courts could well disagree as to a proper construction. Instructions are for the direction and guidance of juries of ordinary laymen. The language of an instruction should be so plain that no doubt can arise as to its meaning. It should be a clear declaration of the law applicable to the facts and not open to two or more constructions, one of which is at variance with the law. [Schipper v. Brashear Truck Co. (Mo.), 132 S. W. (2d) 993, 996.] Since there was no evidence that plaintiff was emancipated, consideration of this item should have been limited to his earning power and capacity after reaching his majority. The amount, if any, allowed by the jury for such loss during minority cannot be ascertained.

The instruction is further subject to criticism for the use of the word "may" which does not sufficiently "carry the idea of reasonable certainty." [Krinard v. Westerman, 279 Mo. 680, 698, 216 S. W. 938, 943.]

It is unnecessary to consider other assignments of error with reference to this instruction or the question of excessiveness of the verdict. For the errors noted in instructions I and II, the judgment is reversed and the cause remanded. *Hyde* and *Bradley*, *CC.*, concur.

PER CURIAM:—The foregoing opinion by DALTON, C., is adopted as the opinion of the court. All the judges concur.